NEW YORK STATE RIFLE AND PISTOL ASSOCIATION, INC., Westchester County Firearms Owners Association, Inc., Sportsmen's Association For Firearms Education, Inc., New York State Amateur Trapshooting Association, Inc., Bedell Custom, Beikirch Ammunition Corporation, Blueline Tactical & Police Supply, LLC, Batavia Marine & Sporting Supply, William Nojay, Thomas Galvin, Roger Horvath, Plaintiffs–Appellants–Cross–Appellees,

v.

Andrew M. CUOMO, in his official capacity as Governor of the State of New York, Eric T. Schneiderman, in his official capacity as Attorney General of the State of New York, Joseph A. D'Amico, in his official capacity as Superintendent of the New York State Police, Defendants–Appellees–Cross–Appellants,

Gerald J. Gill, in his official capacity as Chief of Police for the Town of Lancaster, New York, Lawrence Friedman, Defendants–Appellees,

Frank A. Sedita, III, in his official capacity as District Attorney for Erie County, Defendant.

The Connecticut Citizens' Defense League, The Coalition of Connecticut Sportsmen, June Shew, Rabbi Mitchell Rocklin, Stephanie Cypher, Peter Owens, Brian McClain, Andrew Mueller, Hiller Sports, LLC, Md Shooting Sports, LLC, Plaintiffs–Appellants,

v.

Dannel P. Malloy, in his official capacity as Governor of the State of Connecticut, Kevin T. Kane, in his official capacity as Chief State's Attorney of the State of Connecticut, Dora B. Schriro, in her official capacity as Commissioner of the Connecticut Department of Emergency Services and Public Protection, David I. Cohen, in his official capacity as State's Attorney for the Stamford/Norwalk Judicial District, Geographical Areas Nos. 1 and 20, John C. Smriga, capacity as State's Attorney for the Waterbury Judicial District, Geographical Area No. 4, Kevin D. Lawlor, in his official capacity as State's Attorney for the Ansonia/Milford Judicial District, Geographical Areas Nos. 5 and 22, Michael Dearington, in his official capacity as State's Attorney for the New Haven Judicial District, Geographical Area Nos. 7 and 23, Peter A. McShane, in his official capacity as State's Attorney for the Middlesex Judicial District, Geographical Area No. 9, Michael L. Regan, in his official capacity as State's Attorney for the New London Judicial District, Geographical Area Nos. 10 and 21, Patri-

cia M. Froehlich, Gail P. Hardy, in her official capacity as State's Attorney for the Hartford Judicial District, Geographical Areas Nos. 12, 13, and 14, Brian Preleski, in his official capacity as State's Attorney for the New Britain Judicial District, Geographical Area Nos. 15 and 17, David Shepack, in his official capacity as State's Attorney for the Litchfield Judicial District, Geographical Area No. 18, Matthew C. Gedansky, in his official capacity as State's Attorney for the Tolland Judicial District, Geographical Area No. 19, Stephen J. Sedensky III, in his official capacity as State's Attorney for the Danbury Judicial District, Geographical Area No. 3, Defendants–Appellees.

Nos. 14–36–cv (Lead); 14–37–cv (XAP), 14–319–cv.

United States Court of Appeals, Second Circuit.

Argued: Dec. 9, 2014.

Decided: Oct. 19, 2015.

David Thompson, Charles J. Cooper, Peter A. Patterson, Cooper & Kirk, PLLC, Washington DC, and Brian T. Stapleton, Matthew S. Lerner, Goldberg Segalla LLP, White Plains, N.Y., Stephen P. Halbrook, Fairfax, VA, for Plaintiffs–Appellants.

Barbara D. Underwood, Solicitor General of the State of New York (Anisha S. Dasgupta, Claude S. Platton, Office of the Solicitor General, on the brief), for Eric T. Schneiderman, Attorney General for the State of New York, New York, N.Y., for Defendants–Appellees–Cross–Appellants Andrew M. Cuomo, et al.

Maura B. Murphy Osborne, Assistant Attorney General of the State of Connecticut (Perry Zinn Rowthorn, Michael K. Skold, Gregory T. D'Auria, Office of the Attorney General, on the brief), for George Jepsen, Attorney General of the State of Connecticut, Hartford, CT, for Defendants–Appellees Dannel P. Malloy, et al.

Before: CABRANES, LOHIER, and DRONEY, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge:

Before the Court are two appeals challenging gun-control legislation enacted by the New York and Connecticut legislatures in the wake of the 2012 mass murders at Sandy Hook Elementary School in Newtown, Connecticut. The New York and Connecticut laws at issue prohibit the possession of certain semiautomatic "assault weapons" and large-capacity magazines. Following the entry of summary judgment in favor of defendants on the central claims in both the Western District of New York (William M. Skretny, *Chief Judge*) and the District of Connecticut (Alfred V. Covello, *Judge*), plaintiffs in both suits now press two arguments on appeal. First, they challenge the constitutionality of the statutes under the Second Amendment; and second, they challenge certain provisions of the statutes as unconstitutionally vague. Defendants in the New York action also cross-appeal the District Court's invalidation of New York's separate seven-round load limit and voiding of two statutory provisions as facially unconstitutionally vague.

We hold that the core provisions of the New York and Connecticut laws prohibiting possession of semiautomatic assault weapons and large-capacity magazines do not violate the Second Amendment, and that the challenged individual provisions are not void for vagueness. The particular provision of New York's law regulating load limits, however, does not survive the requisite scrutiny. One further specific provision—Connecticut's prohibition on the non-semiautomatic Remington 7615—unconstitutionally infringes upon the Second Amendment right. Accordingly, we **AF-**

**FIRM** in part the judgment of the District Court for the District of Connecticut insofar as it upheld the prohibition of semiautomatic assault weapons and large-capacity magazines, and **REVERSE** in part its holding with respect to the Remington. With respect to the judgment of the District Court for the Western District of New York, we **REVERSE** in part certain vagueness holdings, and we otherwise **AFFIRM** that judgment insofar as it upheld the prohibition of semiautomatic assault weapons and large-capacity magazines and invalidated the load limit.

## BACKGROUND

### I. Prior "Assault Weapon" Legislation

New York and Connecticut have long restricted possession of certain automatic and semiautomatic firearms that came to be known as "assault weapons." In 1993, Connecticut's General Assembly adopted the state's first assault-weapon ban, which criminalized the possession of firearms "capable of fully automatic, semiautomatic or burst fire at the option of the user," including 67 specifically enumerated semiautomatic firearms.[1]

The following year, after five years of hearings on the harms thought to be caused by certain firearms, the U.S. Congress enacted legislation restricting the manufacture, transfer, and possession of certain "semiautomatic assault weapons."[2] The 1994 federal statute defined "semiau-tomatic assault weapons" in two ways. First, it catalogued 18 specifically prohibited firearms, including, as relevant here, the Colt AR–15. Second, it introduced a "two-feature test," which prohibited any semiautomatic firearm that contained at least two listed military-style features, including a telescoping stock, a conspicuously protruding pistol grip, a bayonet mount, a flash suppressor, and a grenade launcher. The federal statute also prohibited magazines with a capacity of more than ten rounds of ammunition, or which could be "readily restored or converted to accept" more than 10 rounds.[3] The federal assault-weapons ban expired in 2004, pursuant to its sunset provision.[4]

Following the passage of the federal assault-weapons ban, both New York, in 2000, and Connecticut, in 2001, enacted legislation that closely mirrored the federal statute, including the two-feature test for prohibited semiautomatic firearms.[5] Unlike the federal statute, however, these state laws contained no sunset provisions and thus remained in force until amended by the statutes at issue here.

On December 14, 2012, a gunman shot his way into Sandy Hook Elementary School in Newtown, Connecticut and murdered twenty first-graders and six adults using a semiautomatic AR–15–type rifle with ten large-capacity magazines. This appalling attack, in addition to other recent mass shootings, provided the immediate impetus for the legislation at issue in this appeal.[6]

---

1. 1993 Conn. Pub. Acts 93–306, § 1(a) (J.A., No. 14–319–cv, at 943).

2. Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103–322, tit. XI, subtit. A § 110102(b), 108 Stat. 1796, 1997.

3. *Id.* § 110103.

4. *Id.* § 110105.

5. *See* Act of Aug. 8, 2000, ch. 189, § 10, 2000 N.Y. Laws 2788, 2792 (J.A., No. 14–36–cv, at 923–30); 2001 Conn. Pub. Acts 01–130, § 1 (J.A., No. 14–319–cv, at 94960). Like the federal statute, the 2000 New York statute also restricted the possession of certain large-capacity magazines.

6. *See* Defendants' Br., No. 14–36–cv, at 10–11; Defendants' Br., No. 14–319–cv, at 11 & n. 3.

## II. The New York Legislation

New York enacted the Secure Ammunition and Firearms Enforcement Act (SAFE Act) on January 15, 2013.[7] The SAFE Act expands the definition of prohibited "assault weapons" by replacing the prior two-feature test with a stricter one-feature test. As the name suggests, the new test defines a semiautomatic firearm as a prohibited "assault weapon" if it contains any one of an enumerated list of military-style features, including a telescoping stock, a conspicuously protruding pistol grip, a thumbhole stock, a bayonet mount, a flash suppressor, a barrel shroud, and a grenade launcher.[8] This statutory definition encompasses, and thereby bans, the semiautomatic weapon used by the mass-shooter at Sandy Hook. New York law makes the possession, manufacture, transport, or disposal of an "assault weapon" a felony.[9] Pursuant to the SAFE Act's grandfather clause, however, pre-existing lawful owners of banned assault weapons may continue to possess them if they register those weapons with the New York State Police.[10]

The SAFE Act also bans magazines that can hold more than ten rounds of ammunition or that can be readily restored or converted to accept more than ten rounds.[11] Although New York had restricted possession of such magazines since 2000, the SAFE Act eliminated a grandfather clause for magazines manufactured before September 1994.

The SAFE Act's large-capacity-magazine ban contains an additional, unique prohibition on possession of a magazine *loaded* with more than seven rounds of ammunition.[12] (For the purpose of this definition, a round is a single unit of ammunition.) As originally enacted, the SAFE Act would have imposed a magazine

---

7. Act of Jan. 15, 2013, ch. 1, 2013 N.Y. Laws 1, *amended by* Act of Mar. 29, 2013, ch. 57, pt. FF, 2013 N.Y. Laws 290, 389.

8. The prohibited features depend on whether the semiautomatic weapon is a rifle, pistol, or shotgun, though the lists overlap significantly:

 "Assault weapon" means

 (a) a *semiautomatic rifle* that has an ability to accept a detachable magazine and has at least one of the following characteristics: (i) a folding or telescoping stock; (ii) a pistol grip that protrudes conspicuously beneath the action of the weapon; (iii) a thumbhole stock; (iv) a second handgrip or a protruding grip that can be held by the non-trigger hand; (v) a bayonet mount; (vi) a flash suppressor, muzzle break, muzzle compensator, or threaded barrel designed to accommodate a flash suppressor, muzzle break, or muzzle compensator; (vii) a grenade launcher; or

 (b) a *semiautomatic shotgun* that has at least one of the following characteristics: (i) a folding or telescoping stock; (ii) a thumbhole stock; (iii) a second handgrip or a protruding grip that can be held by the non-trigger hand; (iv) a fixed magazine capacity in excess of seven rounds; (v) an ability to accept a detachable magazine; or

 (c) a *semiautomatic pistol* that has an ability to accept a detachable magazine and has at least one of the following characteristics: (i) a folding or telescoping stock; (ii) a thumbhole stock; (iii) a second handgrip or a protruding grip that can be held by the non-trigger hand; (iv) capacity to accept an ammunition magazine that attaches to the pistol outside of the pistol grip; (v) a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer; (vi) a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the non-trigger hand without being burned; (vii) a manufactured weight of fifty ounces or more when the pistol is unloaded; or (viii) a semiautomatic version of an automatic rifle, shotgun or firearm. . . .
 N.Y. Penal Law § 265.00(22) (emphasis supplied).

9. *Id.* §§ 265.02(7), 265.10.

10. *Id.* § 265.00(22)(g)(v).

11. *Id.* § 265.00(23)(a).

12. *Id.* § 265.37.

*capacity* restriction of seven rounds. Because very few seven-round magazines are manufactured, however, the law was subsequently amended to impose a ten-round *capacity* restriction coupled with a seven-round *load limit.* Thus, as amended, the statute permits a New York gun owner to possess a magazine capable of holding up to ten rounds, but he may not fully load it outside of a firing range or official shooting competition.[13]

## III. The Connecticut Legislation

Several months after New York passed the SAFE Act, and after extensive public hearings and legislative and executive study, Connecticut adopted "An Act Concerning Gun Violence Prevention and Children's Safety" on April 4, 2013, and later amended the 8 on June 18, 2013.[14] Like its New York analogue, the Connecticut legislation replaced the state's two-feature definition of prohibited "assault weapons" with a stricter one-feature test,[15] using a list of military-style features similar to New York's, including a telescoping stock, a thumbhole stock, a forward pistol grip, a flash suppressor, a grenade launcher, and a threaded barrel capable of accepting a flash suppressor or silencer.[16] Unlike its counterpart in New York, the Connecticut legislation additionally bans 183 particular assault weapons listed by make and model, as well as "copies or duplicates" of most of those firearms.[17] The Connecticut law

13. *Id.* § 265.20(a)(7–f).

14. 2013 Conn. Pub. Act 13–3, *as amended by* 2013 Conn. Pub. Act 13–220.

15. Conn. Gen.Stat. § 53–202a(1)(E).

16. *Id.* §§ 53–202a(1)(E), 53–202b(a)(1), 53–202c(a). Like New York's SAFE Act, Connecticut's statute differentiates among semiautomatic rifles, pistols, and shotguns:

> "Assault weapon" means ... [a]ny semiautomatic firearm ... that meets the following criteria:
> (i) A semiautomatic, centerfire *rifle* that has an ability to accept a detachable magazine and has at least one of the following: (I) A folding or telescoping stock; (II) Any grip of the weapon, including a pistol grip, a thumbhole stock, or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing; (III) A forward pistol grip; (IV) A flash suppressor; or (V) A grenade launcher or flare launcher; or
> (ii) A semiautomatic, centerfire *rifle* that has a fixed magazine with the ability to accept more than ten rounds; or
> (iii) A semiautomatic, centerfire *rifle* that has an overall length of less than thirty inches; or
> (iv) A semiautomatic *pistol* that has an ability to accept a detachable magazine and has

at least one of the following: (I) An ability to accept a detachable ammunition magazine that attaches at some location outside of the pistol grip; (II) A threaded barrel capable of accepting a flash suppressor, forward pistol grip or silencer; (III) A shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to fire the firearm without being burned, except a slide that encloses the barrel; or (IV) A second hand grip; or
> (v) A semiautomatic *pistol* with a fixed magazine that has the ability to accept more than ten rounds; or
> (vi) A semiautomatic *shotgun* that has both of the following: (I) A folding or telescoping stock; and (II) Any grip of the weapon, including a pistol grip, a thumbhole stock, or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing; or (vii) A semiautomatic shotgun that has the ability to accept a detachable magazine; or (viii) A shotgun with a revolving cylinder....
> *Id.* § 53–202a(1) (emphasis supplied).

17. *Id.* at § 53–202a(1); *see also* Plaintiffs' Br., No. 14–319–cv, at 5; Defendants' Br., No. 14–319–cv, at 14. Of these 183 specifically enumerated prohibited weapons, all but one are semiautomatic weapons. The single non-semiautomatic firearm is the Remington Tac-

makes it a felony to transport, import, sell, or possess semiautomatic "assault weapons," and it also contains a grandfather clause permitting pre-existing owners of assault weapons to continue to possess their firearms if properly registered with the state.[18]

The June 2013 amendment to the Connecticut legislation criminalizes the possession of "[l]arge capacity magazine[s]" that can hold, or can be "readily restored or converted to accept," more than ten rounds of ammunition.[19] Unlike its New York counterpart, however, the Connecticut legislation contains no additional "load limit" rule.

## IV. Procedural History

Plaintiffs—a combination of advocacy groups, businesses, and individual gun owners—filed suit against the governors of New York and Connecticut and other state officials, first in the Western District of New York on March 21, 2013 and then in the District of Connecticut on May 22, 2013. In both actions, plaintiffs sought declaratory and injunctive relief for alleged infringement of their constitutional rights. Specifically, plaintiffs contended that the statutes' prohibitions on semiautomatic assault weapons and large-capacity magazines violate their Second Amendment rights, and that numerous specific provisions of each statute are unconstitutionally vague. In the New York action, plaintiffs also challenged the seven-round load limit as a violation of the Second Amendment.[20]

Following plaintiffs' motions for preliminary injunctions, parties in both suits cross-moved for summary judgment. On December 31, 2013, Chief Judge Skretny of the Western District of New York granted in part and denied in part the cross-motions for summary judgment.[21] Specifically, the District Court found that New York's ban on assault weapons and large capacity magazines burdened plaintiffs' Second Amendment rights, but did not violate the Second Amendment upon application of so-called intermediate scrutiny.[22] The Court also held, however, that the seven-round load limit did not survive intermediate scrutiny. The Court further found that three specific provisions were unconstitutionally vague, and hence void,[23] but denied plaintiffs' motion regarding the remaining provisions challenged for vague-

---

tical Rifle Model 7615, a pump-action rifle. Defendants' Br., No. 14–319–cv, at 58.

**18.** Conn. Gen.Stat. § 53–202d(a)(2)(A).

**19.** *Id.* § 53–202w(a)(1). As with prohibited firearms, pre-ban owners of prohibited magazines can retain them if registered with the state. *Id.* § 53–202x(a)(1).

**20.** Plaintiffs brought additional claims for violation of the Commerce Clause (in the New York action) and the Equal Protection Clause (in the Connecticut action). The District Courts dismissed these claims, which are not at issue on appeal.

**21.** *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo* ("*NYSRPA* "), 990 F.Supp.2d 349 (W.D.N.Y.2013).

**22.** *See post* Section V.d–V.e for further discussion of intermediate scrutiny analysis.

**23.** The three voided provisions of New York's SAFE Act were (1) the prohibition on pistols with a detachable magazine that are "a semiautomatic version of an automatic rifle, shotgun or firearm," N.Y. Penal Law § 265.00(22)(c)(viii); (2) the identification of the misspelled military-style feature "muzzle break," *id.* § 265.00(22)(a)(vi), which defendants concede has no accepted meaning and was intended to read "muzzle brake," *see* Defendants' Br., No. 14–36–cv, at 22; and (3) an erroneous "and if" clause appearing in N.Y. Penal Law § 265.36, which the District Court found to be "incomplete and entirely indecipherable." *NYSRPA*, 990 F.Supp.2d at 376. Defendants do not challenge on appeal the District Court's ruling on this third ("and if") provision.

ness.[24] In sum, Chief Judge Skretny upheld as constitutional, upon intermediate scrutiny, the core provisions of New York's SAFE Act restricting semiautomatic assault weapons and large-capacity magazines, but struck down certain marginal aspects of the law.

On January 30, 2014, Judge Covello of the District of Connecticut granted defendants' motion for summary judgment in its entirety.[25] Like his counterpart in New York, Judge Covello held that the Connecticut legislation burdened plaintiffs' Second Amendment rights, applied intermediate scrutiny, and concluded that the prohibition on semiautomatic assault weapons and large-capacity magazines was fully consistent with the Second Amendment. He also dismissed all of plaintiffs' vagueness claims.[26]

Plaintiffs thereafter appealed. In the New York action only, defendants cross-appeal the District Court's judgment insofar as it invalidated the SAFE Act's seven-round load limit and voided as unconstitutionally vague the SAFE Act's prohibitions on the misspelled "muzzle break"[27] and "semiautomatic version[s]" of an automatic rifle, shotgun, or firearm.[28]

**DISCUSSION**

These appeals present two questions: *first,* whether the Second Amendment permits the regulation of the assault weapons and large-capacity magazines at issue here; and *second,* whether the challenged provisions of the statutes provide constitutionally sufficient notice of the conduct proscribed.

▬ We review *de novo* a district court's order granting summary judgment, construing the evidence in the light most favorable to the non-moving party.[29] As relevant here, we also "review *de novo* the district court's legal conclusions, including those interpreting and determining the constitutionality of a statute."[30] Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

**V. Second Amendment Challenge**

We conclude that the core challenged prohibitions of assault weapons and large-capacity magazines do not violate the Second Amendment. Guided by the teachings of the Supreme Court, our own jurisprudence, and the examples provided by our

---

24. As relevant here, the District Court dismissed plaintiffs' vagueness claims as to the following provisions: (1) the prohibition of magazines that "can be readily restored or converted to accept" more than ten ammunition rounds, N.Y. Penal Law § 265.00(23)(a); (2) the prohibition on semiautomatic shotguns with a "fixed magazine capacity in excess of seven rounds," *id.* § 265.00(22)(b)(iv); and (3) the exclusion from restriction of semiautomatic shotguns "that cannot hold more than five rounds of ammunition in a fixed or detachable magazine," *id.* § 265.00(22)(g)(iii). The Court also rejected four additional vagueness challenges that plaintiffs do not pursue on appeal. *See NYSRPA,* 990 F.Supp.2d at 374–78.

25. *Shew v. Malloy,* 994 F.Supp.2d 234 (D.Conn.2014).

26. Because both judges resolved the parties' motions for summary judgment, they simultaneously denied as moot plaintiffs' respective motions for preliminary injunctions.

27. N.Y. Penal Law § 265.00(22)(a)(vi); *see ante* note 23 and accompanying text.

28. *Id.* § 265.00(22)(c)(viii); *see ante* note 23 and accompanying text.

29. *Delaney v. Bank of America Corp.,* 766 F.3d 163, 167 (2d Cir.2014).

30. *United States v. Stewart,* 590 F.3d 93, 109 (2d Cir.2009).

sister circuits, we adopt a two-step analytical framework, determining first whether the regulated weapons fall within the protections of the Second Amendment and then deciding and applying the appropriate level of constitutional scrutiny. Only two specific provisions—New York's seven-round load limit, and Connecticut's prohibition on the non-semiautomatic Remington 7615—are unconstitutional.

### a. *Heller* and *McDonald*

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." [31] Our analysis of that amendment begins with the seminal decision in *District of Columbia v. Heller.* [32] In *Heller,* the Supreme Court, based on an extensive textual and historical analysis, announced that the Second Amendment's operative clause codified a pre-existing "*individual* right to possess and carry weapons." [33] Recognizing, however, that "the right secured by the Second Amendment is not unlimited," *Heller* emphasized that "the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." [34] Instead, the Second Amendment protects only those weapons " 'in common use' " by citizens "for lawful purposes like self-defense." [35]

Having established these basic precepts, *Heller* concluded that the District of Columbia's ban on possession of handguns was unconstitutional under the Second Amendment. [36] The Supreme Court noted that "handguns are the most popular weapon chosen by Americans for self-defense in the home," where, the Court observed, "the need for defense of self, family, and property is most acute." [37]

*Heller* stopped well short of extending its rationale to other firearms restrictions. Indeed, *Heller* explicitly identified as "presumptively lawful" such "regulatory measures" as "prohibitions on the possession of firearms by felons and the mentally ill, . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, [and] laws imposing conditions and qualifications on the commercial sale of arms." [38] Most importantly here, *Heller* also endorsed the "historical tradition of prohibiting the carrying of dangerous and unusual weapons." [39]

Aside from these broad guidelines, *Heller* offered little guidance for resolving future Second Amendment challenges. The Court did imply that such challenges are subject to one of "the standards of scrutiny that we have applied to enumerated constitutional rights," though it declined to say which, [40] accepting that many applications of the Second Amendment would remain "in doubt." [41]

---

**31.** U.S. Const. amend. II.

**32.** 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008).

**33.** *Id.* at 592, 128 S.Ct. 2783 (emphasis supplied).

**34.** *Id.* at 626, 128 S.Ct. 2783.

**35.** *Id.* at 624, 128 S.Ct. 2783 (citing *United States v. Miller,* 307 U.S. 174, 179, 59 S.Ct. 816, 83 L.Ed. 1206 (1939)).

**36.** *Heller,* 554 U.S. at 635, 128 S.Ct. 2783.

**37.** *Id.* at 628–29, 128 S.Ct. 2783.

**38.** *Id.* at 626–27 & n. 26, 128 S.Ct. 2783.

**39.** *Id.* at 627, 128 S.Ct. 2783 (internal quotation marks omitted).

**40.** *Id.* at 628, 128 S.Ct. 2783.

**41.** *Id.* at 635, 128 S.Ct. 2783.

That doubt persisted after *McDonald v. City of Chicago,* in which the Supreme Court invalidated municipal statutes banning handguns in the home.[42] *McDonald* was a landmark case in one respect—the Court held for the first time that the Fourteenth Amendment "incorporates" the Second Amendment against the states.[43] Otherwise, *McDonald* did not expand upon *Heller's* analysis and simply reiterated *Heller's* assurances regarding the viability of many gun-control provisions.[44] Neither *Heller* nor *McDonald,* then, delineated the precise scope of the Second Amendment or the standards by which lower courts should assess the constitutionality of firearms restrictions.

### b. Analytical Rubric

■ Lacking more detailed guidance from the Supreme Court, this Circuit has begun to develop a framework for determining the constitutionality of firearm restrictions.[45] It requires a two-step inquiry.

First, we consider whether the restriction burdens conduct protected by the Second Amendment.[46] If the challenged restriction does not implicate conduct within the scope of the Second Amendment, our analysis ends and the legislation stands. Otherwise, we move to the second step of our inquiry, in which we must determine and apply the appropriate level of scrutiny.[47]

This two-step rubric flows from the dictates of *Heller* and *McDonald* and our own precedents in *Kachalsky* and *Decastro.*[48] It also broadly comports with the prevailing two-step approach of other courts, including the Third, Fourth, Fifth, Sixth, Seventh, Ninth, Tenth, Eleventh, and D.C. Circuits,[49] and with the approach used in "other areas of constitutional law."[50]

### c. First Step: Whether the Second Amendment Applies

■ As an initial matter, then, we must determine whether the challenged legislation impinges upon conduct protected by the Second Amendment. The Second Amendment protects only "the sorts of

---

**42.** 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). *See, e.g.,* Joseph Blocher, *New Approaches to Old Questions in Gun Scholarship,* 50 TULSA L.REV. 477, 478 (2015) (*"Heller* and *McDonald* provoked as many questions as they answered," creating a "resulting void [that] invites and practically demands more scholarship.").

**43.** *See generally* LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 1317 (3d ed.2000) (describing the process by which Amendments initially designed to limit the powers of the federal government came to be applied to actions of the states).

**44.** 561 U.S. at 786 (opinion of Alito, J.).

**45.** *See Kachalsky v. Cty. of Westchester,* 701 F.3d 81 (2d Cir.2012); *United States v. Decastro,* 682 F.3d 160 (2d Cir.2012).

**46.** *Kachalsky,* 701 F.3d at 93.

**47.** *See id.*

**48.** *See ante* note 45.

**49.** *See GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs,* 788 F.3d 1318, 1322 (11th Cir.2015); *United States v. Chovan,* 735 F.3d 1127, 1136 (9th Cir.2013); *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives,* 700 F.3d 185, 194 (5th Cir.2012); *United States v. Greeno,* 679 F.3d 510, 518 (6th Cir.2012); *Heller v. District of Columbia (Heller II),* 670 F.3d 1244, 1252 (D.C.Cir.2011); *Ezell v. City of Chicago,* 651 F.3d 684, 702–03 (7th Cir.2011); *United States v. Chester,* 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Reese,* 627 F.3d 792, 800–01 (10th Cir.2010); *United States v. Marzzarella,* 614 F.3d 85, 89 (3d Cir.2010).

**50.** *Decastro,* 682 F.3d at 167; *see Heller,* 554 U.S. at 595, 128 S.Ct. 2783; *Kachalsky,* 701 F.3d at 94.

weapons" that are (1) "in common use" [51] and (2) "typically possessed by law-abiding citizens for lawful purposes." [52] We consider each requirement in turn.

### i. Common Use

■ The parties contest whether the assault weapons at issue here are commonly owned. Plaintiffs argue that the weapons at issue are owned in large numbers by law-abiding Americans. They present statistics showing that nearly four million units of a single assault weapon, the popular AR–15, have been manufactured between 1986 and March 2013.[53] Plaintiffs further assert that only 7.5 percent of assault-weapon owners are active law enforcement officers,[54] and that most owners of assault weapons own only one or two such weapons, such that the banned firearms are not concentrated in a small number of homes, but rather spread widely among the gun-owning public.[55] Defendants counter that assault weapons only represent about two percent of the nation's firearms (admittedly amounting to approximately seven million guns).[56] Moreover, defendants argue that the statistics inflate the number of individual civilian owners because many of these weapons are purchased by law enforcement or smuggled to criminals, and many civilian gun owners own multiple assault weapons.

This much is clear: Americans own millions of the firearms that the challenged legislation prohibits.

The same is true of large-capacity magazines, as defined by the New York and Connecticut statutes. Though fewer statistics are available for magazines, those statistics suggest that about 25 million large-capacity magazines were available in 1995, shortly after the federal assault weapons ban was enacted, and nearly 50 million such magazines—or nearly two large-capacity magazines for each gun capable of accepting one—were approved for import by 2000.[57]

Even accepting the most conservative estimates cited by the parties and by amici, the assault weapons and large-capacity magazines at issue are "in common use" as that term was used in *Heller*. The D.C. Circuit reached the same conclusion in its well-reasoned decision in *Heller II*, which upheld the constitutionality of a District of Columbia gun-control act substantially similar to those at issue here.[58]

To be sure, as defendants note, these assault weapons and large-capacity magazines are not as commonly owned as the handguns at issue in *Heller*, which were "the most popular weapon chosen by Americans for self-defense in the home." [59] But nothing in *Heller* limited its holding to handguns; indeed, the Court emphasized that "the Second Amendment extends, prima facie, to *all* instruments that constitute

---

51. *Heller*, 554 U.S. at 627, 128 S.Ct. 2783.

52. *Id.* at 625, 128 S.Ct. 2783. In addition, the weapons must actually be used lawfully. *Id.* Because the laws at issue restrict the mere possession of assault weapons, and not how or why they are used, we need not consider that additional limitation.

53. J.A., No. 14–319–cv, at 146.

54. J.A., No. 14–36–cv, at 162.

55. Plaintiffs' Reply Br., No. 14–36–cv, at 6–7.

56. *See* J.A., No. 14–36–cv, at 1091; J.A., No. 14–319–cv, at 2251.

57. J.A., No. 14–319–cv, at 578.

58. *Heller II*, 670 F.3d at 1261 (finding that the AR–15 and magazines with capacities exceeding ten rounds were in "common use" as defined by *Heller*).

59. *Heller*, 554 U.S. at 629, 128 S.Ct. 2783.

bearable arms," not just to a small subset.[60]

### ii. Typical Possession

We must next determine whether assault weapons and large-capacity magazines are "typically possessed by law-abiding citizens for lawful purposes."[61] While "common use" is an objective and largely statistical inquiry, "typical[ ] possess[ion]" requires us to look into both broad patterns of use and the subjective motives of gun owners.

The parties offer competing evidence about these weapons' "typical use." Plaintiffs suggest that assault weapons are among the safest and most effective firearms for civilian self-defense.[62] Defendants disagree, arguing that these weapons are used disproportionately in gun crimes, rather than for lawful pursuits like self-defense and hunting.[63]

Even if defendants are correct,[64] however, the same could be said for the handguns in *Heller*. Though handguns comprise only about one-third of the nation's firearms, by some estimates they account for 71 percent to 83 percent of the firearms used in murders and 84 percent to 90 percent of the firearms used in other violent crimes.[65] That evidence of disproportionate criminal use did not prevent the Supreme Court from holding that handguns merited constitutional protection.

Looking solely at a weapon's association with crime, then, is insufficient. We must also consider more broadly whether the weapon is "dangerous and unusual" in the hands of law-abiding civilians. *Heller* expressly highlighted "weapons that are most useful in military service," such as the fully automatic M–16 rifle, as weapons that could be banned without implicating the Second Amendment.[66] But this analysis is difficult to manage in practice. Because the AR–15 is "the civilian version of the military's M–16 rifle,"[67] defendants urge that it should be treated identically for Second Amendment purposes. But the Supreme Court's very choice of descriptor for the AR–15—the "civilian version"— could instead imply that such guns "traditionally have been widely accepted as lawful."[68]

Ultimately, then, neither the Supreme Court's categories nor the evidence in the record cleanly resolves the question of whether semiautomatic assault weapons and large-capacity magazines are "typically possessed by law-abiding citizens for

**60.** *Id.* at 582, 128 S.Ct. 2783 (emphasis supplied).

**61.** *Id.* at 625, 128 S.Ct. 2783.

**62.** J.A., No. 14–319–cv, at 753–66 (declaration of ballistics researcher).

**63.** *See* Defendants' Br., No. 14–319–cv, at 38–46; *see also* J.A., No. 14–319–cv at 1365–74, 1699–1715 (affidavits of chiefs of police opining that assault weapons may not be well suited for self-defense, especially in an urban environment); J.A., No. 14–319–cv, at 1395–1413.

**64.** Plaintiffs take issue with the research methodology, and point to studies undermining the conclusion of disproportionate use.

*See* Plaintiffs' Reply Br., No. 14–36–cv, at 15–17; *see also* J.A., No. 14–36–cv, at 464–65, 489–90.

**65.** Plaintiffs' Reply Br., No. 14–36–cv, at 15–18; *see also·Heller*, 554 U.S. at 698, 128 S.Ct. 2783 (Breyer, J., dissenting) (discussing similar statistics suggesting that handguns "appear to be a very popular weapon among criminals").

**66.** 554 U.S. at 627, 128 S.Ct. 2783 (internal quotation marks omitted).

**67.** *Staples v. United States*, 511 U.S. 600, 603, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994).

**68.** *Id.* at 612, 114 S.Ct. 1793.

lawful purposes." [69] Confronting this record, Chief Judge Skretny reasonably found that reliable empirical evidence of lawful possession for lawful purposes was "elusive," [70] beyond ownership statistics. [71] We agree.

In the absence of clearer guidance from the Supreme Court or stronger evidence in the record, we follow the approach taken by the District Courts and by the D.C. Circuit in *Heller II* and assume for the sake of argument that these "commonly used" weapons and magazines are also "typically possessed by law-abiding citi-zens for lawful purposes." [72] In short, we proceed on the assumption that these laws ban weapons protected by the Second Amendment. This assumption is warranted at this stage, because, as explained *post* Section V.e, the statutes at issue nonetheless largely pass constitutional muster. [73]

### d. Second Step: Level of Scrutiny

Having concluded that the statutes impinge upon Second Amendment rights, we must next determine and apply the appropriate level of scrutiny. [74] We employ the

---

69. *Heller*, 554 U.S. at 625, 128 S.Ct. 2783.

70. *NYSRPA*, 990 F.Supp.2d at 365.

71. On a substantially similar record, Judge Covello of the District of Connecticut came to the same conclusion, finding only that the relevant weapons were *"presumably* [ ] used for lawful purposes." *Shew*, 994 F.Supp.2d at 246 (emphasis supplied).

72. See *Heller II*, 670 F.3d at 1260–61 (quoting *Heller*, 554 U.S. at 625, 128 S.Ct. 2783).

73. Though we *assume without deciding* that the bulk of the challenged legislation is entitled to Second Amendment protection, we *decide* as much with respect to Connecticut's prohibition of the Remington Tactical 7615, a non-semiautomatic pump-action rifle. *See* Defendants' Br., No. 14–319–cv, at 58.

*Heller* emphasizes that the "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Heller*, 554 U.S. at 582, 128 S.Ct. 2783. In other words, it identifies a presumption in favor of Second Amendment protection, which the State bears the initial burden of rebutting. *See Ezell*, 651 F.3d at 702–03 ("[I]f *the government can establish* that a challenged firearms law regulates activity falling outside the scope of the Second Amendment ... then the analysis can stop there...." (emphasis supplied)); *cf. Virginia v. Black*, 538 U.S. 343, 369, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003) (Scalia, J., concurring in part, concurring in the judgment in part, and dissenting in part) (defining "prima facie evidence" as that which, "if unexplained or uncontradicted, is sufficient to sustain a judg-ment in favor of the issue which it supports" (quoting Black's Law Dictionary 1190 (6th ed.1990))). Because the State, focused on semiautomatic weapons, *see post* note 112, has failed to make any argument that this pump-action rifle is dangerous, unusual, or otherwise not within the ambit of Second Amendment protection, the presumption that the Amendment applies remains unrebutted.

To be sure, *Heller* also noted that certain "presumptively lawful regulatory measures" ostensibly fall outside of the Second Amendment's *prima facie* protections. *Id.* at 627 n. 26, 128 S.Ct. 2783. Nonetheless, like the D.C. Circuit in *Heller II*, we conclude that these particular restrictions are not entitled to "a *presumption* of validity." *Heller II*, 670 F.3d at 1260 (emphasis supplied).

We emphasize that our holding with respect to the Remington 7615—at both steps of our analysis—reflects the State's failure to present any argument at all regarding this weapon or others like it. We do not foreclose the possibility that states could in the future present evidence to support such a prohibition.

74. Plaintiffs' effort to avoid the two-step framework laid out here is unavailing. They argue that the application of means-ends scrutiny in this case would be an "exercise in futility." Plaintiff's Br., No. 14–36–cv, at 13 (quoting *Kachalsky*, 701 F.3d at 89 n. 9); Plaintiff's Br., No. 14–319–cv, at 12 (same). We reject that argument. As plaintiffs themselves concede, this Court made very clear in *Kachalsky* that *"Heller's* reluctance to announce a standard of review" should *not* be interpreted as a "signal that courts must look solely to the text, history, and tradition of the

familiar "levels of scrutiny" analysis introduced in the famous Footnote Four of *United States v. Carolene Products Co.*,[75] and begin by asking which level of judicial "scrutiny" applies.

 Though *Heller* did not specify the precise level of scrutiny applicable to firearms regulations, it rejected mere rational basis review as insufficient for the type of regulation challenged there.[76] At the same time, this Court and our sister Circuits have suggested that heightened scrutiny is not always appropriate. In determining whether heightened scrutiny applies, we consider two factors: (1) "how close the law comes to the core of the Second Amendment right" and (2) "the severity of the law's burden on the right."[77] Laws that neither implicate the core protections of the Second Amendment nor substantially burden their exercise do not receive heightened scrutiny.

### i. The Core of the Right

By their terms, the statutes at issue implicate the core of the Second Amendment's protections by extending into the home, "where the need for defense of self, family and property is most acute."[78] Semiautomatic assault weapons and large-capacity magazines are commonly owned by many law-abiding Americans, and their complete prohibition, including within the home, requires us to consider the scope of Second Amendment guarantees "at their zenith."[79] At the same time, the regulated weapons are not nearly as popularly owned and used for self-defense as the handgun, that "quintessential self-defense weapon."[80] Thus these statutes implicate Second Amendment rights, but not to the same extent as the laws at issue in *Heller* and *McDonald*.

### ii. The Severity of the Burden

In *Decastro*, we explained that heightened scrutiny need not apply to "any mar-

Second Amendment to determine whether a state can limit the right without applying any sort of means-end scrutiny." 701 F.3d at 89 n. 9. On the contrary, *Heller* indicated that the typical "standards of scrutiny" analysis *should* apply to regulations impinging upon Second Amendment rights, but that D.C.'s handgun ban would fail "[u]nder any of the standards of scrutiny." 554 U.S. at 628, 128 S.Ct. 2783.

**75.** 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938); *see Heller*, 554 U.S. at 628 n. 27, 128 S.Ct. 2783.

**76.** 554 U.S. at 628 n. 27, 128 S.Ct. 2783. At the same time, *Heller's* approval of certain "presumptively lawful regulatory measures," *id.* at 627 n. 26, 128 S.Ct. 2783, has been construed by some to rule out strict scrutiny as well. Indeed, Justice Breyer's *dissent* states, without opposition from the Court's opinion, that "the majority implicitly, and appropriately, reject[ed] th[e] suggestion [to apply strict scrutiny to gun regulations] by broadly approving a set of laws ... whose constitutionality under a strict scrutiny stan-

dard would be far from clear." *Id.* at 688, 128 S.Ct. 2783 (Breyer, J., dissenting). Chief Judge Skretny cited this interpretation with approbation. *NYSRPA*, 990 F.Supp.2d at 366. Upon closer inspection, however, we think it likely that the *Heller* majority identified these "presumptively lawful" measures in an attempt to clarify the scope of the Second Amendment's reach in the first place—the first step of our framework—but not to intimate a view as to whether strict scrutiny applies in the second step.

**77.** *See Ezell*, 651 F.3d at 703.

**78.** *Heller*, 554 U.S. at 628, 128 S.Ct. 2783. This conclusion is predicated on our earlier *assumption* that the commonly used firearms at issue are also typically used for self-defense or other lawful purposes, and thus the prohibitions implicate the Second Amendment right. *See ante* V.c.ii.

**79.** *Kachalsky*, 701 F.3d at 89.

**80.** *Heller*, 554 U.S. at 629, 128 S.Ct. 2783.

ginal, incremental or even appreciable restraint on the right to keep and bear arms."[81] Rather, "heightened scrutiny is triggered *only* by those restrictions that (like the complete prohibition on handguns struck down in *Heller*) operate as a substantial burden on the ability of law-abiding citizens to possess and use a firearm for ... lawful purposes."[82] Our later decision in *Kachalsky* confirmed this approach, concluding that "some form of heightened scrutiny would be appropriate" for regulations that impose a "substantial burden" on Second Amendment rights.[83]

The practice of applying heightened scrutiny only to laws that "burden the Second Amendment right *substantially*" is, as we noted in *Decastro,* broadly consistent with our approach to other fundamental constitutional rights, including those protected by the First and Fourteenth Amendments.[84] We typically require a threshold showing to trigger heightened scrutiny of laws alleged to implicate such constitutional contexts as takings, voting rights, and free speech.[85] Though we have historically expressed "hesitan[ce] to import *substantive* First Amendment prin-

ciples wholesale into Second Amendment jurisprudence,"[86] we readily "consult principles from other areas of constitutional law, including the First Amendment" in determining whether a law "substantially burdens Second Amendment rights."[87]

■■■ The scope of the legislative restriction and the availability of alternatives factor into our analysis of the "degree to which the challenged law burdens the right."[88] No "substantial burden" exists—and hence heightened scrutiny is not triggered—"if adequate alternatives remain for law-abiding citizens to acquire a firearm for self-defense."[89]

■■■ The laws at issue are both broad and burdensome. Unlike statutes that "merely regulate the *manner* in which persons may exercise their Second Amendment rights," these laws impose an outright ban statewide.[90] The "absolute *prohibition*" instituted in both states thus creates a "serious encroachment" on the Second Amendment right.[91] These statutes are not mere "marginal, incremental or even appreciable restraint[s] on the right to keep and bear arms."[92] They

81. *Decastro,* 682 F.3d at 166.

82. *Id.* (emphasis supplied).

83. 701 F.3d at 93.

84. *Decastro,* 682 F.3d at 166–67 (emphasis supplied).

85. *Id.*

86. *Kachalsky,* 701 F.3d at 91 (emphasis in original).

87. *Decastro,* 682 F.3d at 167.

88. United States v. Chester, 628 F.3d 673, 682 (4th Cir.2010).

89. *Decastro,* 682 F.3d at 168; *see also Heller II,* 670 F.3d at 1262 (drawing the comparison to First Amendment speech restrictions, whereby "severe burdens" that "don't leave

open ample alternative channels" trigger strict scrutiny, while restrictions that "leave open ample alternative channels" are merely "modest burdens" and require only "a mild form of intermediate scrutiny").

90. *Chovan,* 735 F.3d at 1138.

91. *Ezell,* 651 F.3d at 705, 708.

92. *Decastro,* 682 F.3d at 166. The legislation at issue is thus easily distinguished from a New York statute imposing a gun-licensing fee of $100 per year, which we found to be no more than a "marginal, incremental or even appreciable restraint" on Second Amendment rights. *Kwong v. Bloomberg,* 723 F.3d 160, 167 (2d Cir.2013). The regulation in *Kwong* involved neither the outright prohibition of weapons in common use nor any direct limitation on the exercise of Second Amendment rights within the home.

impose a substantial burden on Second Amendment rights and therefore trigger the application of some form of heightened scrutiny.

Heightened scrutiny need not, however, "be akin to strict scrutiny when a law burdens the Second Amendment"—particularly when that burden does not constrain the Amendment's "core" area of protection.[93] The instant bans are dissimilar from D.C.'s unconstitutional prohibition of "an entire class of 'arms' that is overwhelmingly chosen by American society for [the] lawful purpose" of self-defense.[94] New York and Connecticut have not banned an entire class of arms. Indeed, plaintiffs themselves acknowledge that there is no class of firearms known as "semiautomatic assault weapons"—a descriptor they call purely political in nature.[95] Plaintiffs nonetheless argue that the legislation does prohibit "firearms of a universally recognized *type*—semiautomatic."[96] Not so. Rather, both New York and Connecticut ban only a limited subset of semiautomatic firearms, which contain one or more enumerated military-style features. As *Heller* makes plain, the fact that the statutes at issue do *not* ban "an entire class of 'arms'" makes the restrictions substantially less burdensome.[97] In both states, citizens may continue to arm themselves with non-semiautomatic weapons *or* with any semiautomatic gun that does not contain any of the enumerated military-style features. Similarly, while citizens may not acquire high-capacity magazines, they can purchase any number of magazines with a capacity of ten or fewer rounds. In sum, numerous "alternatives remain for law-abiding citizens to acquire a firearm for self-defense."[98] We agree with the D.C. Circuit that "the prohibition of semi-automatic rifles and large-capacity magazines does not effectively disarm individuals or substantially affect their ability to defend themselves."[99] The burden imposed by the challenged legislation is real, but it is not "severe."[100]

Accordingly, we conclude that intermediate, rather than strict, scrutiny is appropriate. This conclusion coheres not only with that reached by the D.C. Circuit when considering substantially similar gun-control laws, but also with the analyses undertaken by other courts, many of which have applied intermediate scrutiny to laws im-

---

93. *Kachalsky*, 701 F.3d at 93.

94. *Heller*, 554 U.S. at 628, 128 S.Ct. 2783.

95. Plaintiffs' Br., No. 14–36–cv, at 17; Plaintiffs' Br., No. 14–319–cv, at 16.

96. Plaintiff's Br., No. 14–319–cv, at 31.

97. *See* 554 U.S. at 628, 128 S.Ct. 2783.

98. *Decastro*, 682 F.3d at 168. Plaintiffs' related argument—that the availability of unbanned firearms "is irrelevant under *Heller*," *see* Plaintiffs' Br., No. 14–36–cv, at 32—rests on a misapprehension of the Supreme Court's logic. To be sure, *Heller* did indicate that "[i]t is no answer to say ... that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*,

long guns) is allowed." 554 U.S. at 629, 128 S.Ct. 2783. But *Heller* went on to explain that handguns are protected as "the most popular weapon chosen by Americans for self-defense in the home." *Id.* Of course, the same cannot be said of the weapons at issue here. *Heller* explicitly endorsed prohibitions against any "weapons not typically possessed by law-abiding citizens for lawful purposes," including, for example, short-barreled shotguns. *Id.* at 625, 128 S.Ct. 2783. Our consideration of available alternatives for self-defense thus squares with *Heller's* focus on protecting that "core lawful purpose" of the Second Amendment right. *Id.* at 630, 128 S.Ct. 2783.

99. *Heller II*, 670 F.3d at 1262.

100. *See id.*

plicating the Second Amendment.[101]

### e. Application of Intermediate Scrutiny

Though "intermediate scrutiny" may have different connotations in different contexts,[102] here the key question is whether the statutes at issue are "substantially related to the achievement of an important governmental interest." [103] It is beyond cavil that both states have "substantial, indeed compelling, governmental interests in public safety and crime prevention." [104] We need only inquire, then, whether the challenged laws are "substantially related" to the achievement of that governmental interest. We conclude that the prohibitions on semiautomatic assault weapons and large-capacity magazines meet this standard.

### i. Prohibition on "Assault Weapons"

 To survive intermediate scrutiny, the "fit between the challenged regulation [and the government interest] need only be substantial, not perfect." [105] Un-

like strict scrutiny analysis, we need not ensure that the statute is "narrowly tailored" or the "least restrictive available means to serve the stated governmental interest." [106] Moreover, we have observed that state regulation of the right to bear arms "has always been more robust" than analogous regulation of other constitutional rights.[107] So long as the defendants produce evidence that "fairly support[s]" their rationale, the laws will pass constitutional muster.[108]

 In making this determination, we afford "substantial deference to the predictive judgments of the legislature." [109] We remain mindful that, "[i]n the context of firearm regulation, the legislature is 'far better equipped than the judiciary' to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." [110] Our role, therefore, is only to assure ourselves that, in formulating their respective laws, New York and Connecticut have "drawn reasonable inferences based on substantial

---

**101.** *See, e.g., Chovan,* 735 F.3d at 1138; *Nat'l Rifle Ass'n of Am.,* 700 F.3d at 207; *Chester,* 628 F.3d at 683; *Reese,* 627 F.3d at 802; *Marzzarella,* 614 F.3d at 97.

**102.** *Ernst J. v. Stone,* 452 F.3d 186, 200 n. 10 (2d Cir.2006) (noting that intermediate scrutiny carries different meanings depending on the area of law in which it arises, and then applying the same definition of intermediate scrutiny used here).

**103.** *Kachalsky,* 701 F.3d at 96.

**104.** *Id.* at 97; *see also Schall v. Martin,* 467 U.S. 253, 264, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984) ("The legitimate and compelling state interest in protecting the community from crime cannot be doubted." (internal quotation marks omitted)).

**105.** *Kachalsky,* 701 F.3d at 97 (internal quotation marks omitted).

**106.** *Id.*

**107.** *Id.* at 100. States are permitted to restrict the right to bear arms by felons and the mentally ill, while equivalent restrictions on the right to speech or religious freedoms among those populations would unquestionably be unconstitutional. *Id.*

**108.** *City of Los Angeles v. Alameda Books, Inc.,* 535 U.S. 425, 438, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002) (plurality).

**109.** *Kachalsky,* 701 F.3d at 97 (quoting *Turner Broad. Sys., Inc. v. Fed. Commc'ns Comm'n,* 520 U.S. 180, 195, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) (brackets omitted)).

**110.** *Kachalsky,* 701 F.3d at 97 (quoting *Turner Broad. Sys., Inc. v. Fed. Commc'ns Comm'n,* 512 U.S. 622, 665, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994)) (opinion of Kennedy, J.).

evidence." [111]

■■■ Both states have done so with respect to their prohibitions on certain semiautomatic firearms.[112] At least since the enactment of the federal assault-weapons ban, semiautomatic assault weapons have been understood to pose unusual risks. When used, these weapons tend to result in more numerous wounds, more serious wounds, and more victims.[113] These weapons are disproportionately used in crime, and particularly in criminal mass shootings like the attack in Newtown.[114] They are also disproportionately used to kill law enforcement officers: one study shows that between 1998 and 2001, assault weapons were used to gun down at least twenty percent of officers killed in the line of duty.[115]

The record reveals that defendants have tailored the legislation at issue to address these particularly hazardous weapons. The dangers posed by some of the military-style features prohibited by the statutes—such as grenade launchers

and silencers—are manifest and incontrovertible.[116] As for the other enumerated military-style features—such as the flash suppressor, protruding grip, and barrel shrouds—New York and Connecticut have determined, as did the U.S. Congress, that the "net effect of these military combat features is a capability for lethality— more wounds, more serious, in more victims—far beyond that of other firearms in general, including other semiautomatic guns." [117] Indeed, plaintiffs explicitly contend that these features improve a firearm's "accuracy," "comfort," and "utility." [118] This circumlocution is, as Chief Judge Skretny observed, a milder way of saying that these features make the weapons more deadly.[119]

The legislation is also specifically targeted to prevent mass shootings like that in Newtown, in which the shooter used a semiautomatic assault weapon. Plaintiffs complain that mass shootings are "particularly rare events" and thus, even if successful, the legislation will have a "minimal

---

**111.** *Turner Broad. Sys.*, 520 U.S. at 195, 117 S.Ct. 1174.

**112.** Though Connecticut's ban on semiautomatic firearms passes intermediate scrutiny, its prohibition of a single non-semiautomatic weapon, the Remington 7615, does not. Focused as it was on the rationale for banning semiautomatic weapons, Connecticut fails to set forth the requisite "substantial evidence" with respect to the pump-action Remington 7615. *Id.* at 195, 117 S.Ct. 1174; *see also ante* note 73. Accordingly, we hold that this singular provision of Connecticut's legislation is unconstitutional.

**113.** *See* Defendant's Br., No. 14–36–cv, at 48 (quoting J.A., No. 14–36–cv, at 733–34).

**114.** *See id.* at 49 (citing J.A., No. 14–36–cv 565, 727, 729).

**115.** *See* J.A., No. 14–36–cv, at 1261 (citing Violence Policy Center study).

**116.** Indeed, plaintiffs have not seriously attempted to argue—either here or before the

District Court—that such features are protected by the Second Amendment at all, much less that their prohibition should fail intermediate scrutiny. *See NYSRPA*, 990 F.Supp.2d at 369–70 ("Plaintiffs do not explicitly argue that the Act's regulation of firearms with [grenade launchers, bayonet mounts, or silencers] violates the Second Amendment."); *cf. Norton v. Sam's Club*, 145 F.3d 114, 119 (2d Cir.1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal."); *United States v. Amer*, 110 F.3d 873, 879 (2d Cir. 1997) (finding that defendant forfeited one of his constitutional arguments by failing to raise it before the District Court).

**117.** J.A., No. 14–36–cv, at 733–34.

**118.** Plaintiffs' Br., No. 14–36–cv, at 20; Plaintiffs' Br., No. 14–319–cv, at 19–20.

**119.** *NYSRPA*, 990 F.Supp.2d at 368.

impact" on most violent crime.[120] That may be so. But gun-control legislation "need not strike at all evils at the same time" to be constitutional.[121]

Defendants also have adduced evidence that the regulations will achieve their intended end of reducing circulation of assault weapons among criminals.[122] Plaintiffs counter—without record evidence—that the statutes will primarily disarm law-abiding citizens and will thus impair the very public-safety objectives they were designed to achieve.[123] Given the dearth of evidence that law-abiding citizens typically use these weapons for self-defense, *see ante* Section V.c.ii, plaintiffs' concerns are speculative at best, and certainly not strong enough to overcome the "substantial deference" we owe to "predictive judgments of the legislature" on matters of public safety.[124] The mere possibility that some subset of people intent on breaking the law will indeed ignore these statutes does not make them unconstitutional.

Ultimately, "[i]t is the legislature's job, not ours, to weigh conflicting evidence and make policy judgments."[125] We must merely ensure that the challenged laws are substantially—even if not perfectly—related to the articulated governmental interest. The prohibition of semiautomatic assault weapons passes this test.[126]

### ii. Prohibition on Large-Capacity Magazines

 The same logic applies *a fortiori* to the restrictions on large-capacity magazines.[127] The record evidence suggests that large-capacity magazines may "present even greater dangers to crime and violence than assault weapons alone, in part because they are more prevalent and can be and are used ... in both assault weapons and non-assault weapons."[128] Large-capacity magazines are disproportionately used in mass shootings, like the one in Newtown, in which the shooter used multiple large-capacity magazines to fire 154 rounds in less than five minutes.[129] Like assault weapons, large-capacity mag-

---

120. Plaintiffs' Br., No. 14–36–cv, at 48–49; Plaintiffs' Br., No. 14–319–cv, at 48–49.

121. *Nat'l Rifle Ass'n of Am.,* 700 F.3d at 211 (quoting *Buckley v. Valeo,* 424 U.S. 1, 105, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)).

122. *See* Defendants' Br., No. 14–319–cv, at 71–75 (citing, *inter alia,* research by Prof. Christopher S. Koper, evaluating the impact of the federal assault weapons ban, J.A., No. 14–319–cv, at 1404).

123. Plaintiffs' Br., No. 14–36–cv, at 45–46; Plaintiffs' Br., No. 14–319–cv, at 45–46.

124. *Kachalsky,* 701 F.3d at 97 (quoting *Turner Broad. Sys.,* 520 U.S. at 195, 117 S.Ct. 1174 (brackets omitted)).

125. *Id.* at 99.

126. *Cf. Heller II,* 670 F.3d at 1263 ("[T]he evidence demonstrates a ban on assault weapons is likely to promote the Government's interest in crime control...."). Again, our

holding is limited insofar as it does not apply to Connecticut's prohibition of the non-semiautomatic Remington 7615.

127. *Amici* argue that large-capacity magazines are entirely outside of Second Amendment protection for the independent reason that such magazines constitute firearm "accessories" rather than protected "arms." *See* Br. of *Amici Curiae* Law Center To Prevent Gun Violence and New Yorkers Against Gun Violence, No. 14–36–cv, at 8–13; Br. of *Amici Curiae* Law Center To Prevent Gun Violence, Connecticut Against Gun Violence, and Cleveland School Remembers, No. 14–319–cv, at 10–14. Because we conclude that the prohibition of large-capacity magazines would survive the requisite scrutiny, we need not reach the merits of this additional argument.

128. J.A., No. 14–319–cv, at 1400.

129. Defendants' Br., No. 14–319–cv, at 11, 38–39.

azines result in "more shots fired, persons wounded, and wounds per victim than do other gun attacks." [130] Professor Christopher Koper, a firearms expert relied upon by all parties in both states, stated that it is "particularly" the ban on large-capacity magazines that has the greatest "potential to prevent and limit shootings in the state over the long-run." [131]

We therefore conclude that New York and Connecticut have adequately established a substantial relationship between the prohibition of both semiautomatic assault weapons and large-capacity magazines and the important—indeed, compelling—state interest in controlling crime. These *prohibitions survive intermediate scrutiny*.

### iii. Seven–Round Load Limit

■ Though the key provisions of both statutes pass constitutional muster on this record, another aspect of New York's SAFE Act does not: the seven-round load limit, which makes it "unlawful for a person to knowingly possess an ammunition feeding device where such device contains more than seven rounds of ammunition." [132]

As noted above, the seven-round load limit was a second-best solution. New York determined that only magazines containing seven rounds or fewer can be safely possessed, but it also recognized that seven-round magazines are difficult to obtain commercially. Its compromise was to permit gun owners to use ten-round maga-

zines if they were loaded with seven or fewer rounds. [133]

On the record before us, we cannot conclude that New York has presented sufficient evidence that a seven-round load limit would best protect public safety. Here we are considering not a capacity restriction, but rather a load limit. Nothing in the SAFE Act will outlaw or reduce the number of ten-round magazines in circulation. It will not decrease their availability or in any way frustrate the access of those who intend to use ten-round magazines for mass shootings or other crimes. It is thus entirely untethered from the stated rationale of reducing the number of assault weapons and large capacity magazines in circulation. [134] New York has failed to present evidence that the mere existence of this load limit will convince any would-be malefactors to load magazines capable of holding ten rounds with only the permissible seven.

■ To be sure, the mere possibility of criminal disregard of the laws does not foreclose an attempt by the state to enact firearm regulations. But on intermediate scrutiny review, the state cannot "get away with shoddy data or reasoning." [135] To survive intermediate scrutiny, the defendants must show "*reasonable* inferences based on *substantial* evidence" that the statutes are substantially related to the governmental interest. [136] With respect to the load limit provision alone, New York has failed to do so.

---

130. *Heller II*, 670 F.3d at 1263 (internal quotation marks omitted); *see also* Defendants' Br., No. 14–36–cv, at 59–60.

131. J.A., No. 14–319–cv, at 1410.

132. N.Y. Penal Law § 265.37; *see ante* notes 12–13 and accompanying text.

133. *See* Defendants' Br., No. 14–36–cv, at 15–16.

134. *See id.* at 55.

135. *Alameda Books*, 535 U.S. at 438, 122 S.Ct. 1728.

136. *Turner Broad. Sys.*, 520 U.S. at 195, 117 S.Ct. 1174 (emphasis supplied).

## VI. Vagueness Challenge

We turn now to plaintiffs' second challenge to the New York and Connecticut laws—their claim that provisions of both statutes are unconstitutionally vague. The New York defendants cross-appeal Chief Judge Skretny's ruling that two provisions of the SAFE Act are void because of vagueness.

### a. Legal Standards

▮▮▮ Grounded in due process principles, the void-for-vagueness doctrine provides that "[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." [137] The doctrine requires that "a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." [138] Statutes carrying criminal penalties or implicating the exercise of constitutional rights, like the ones at issue here, are subject to a "more stringent" vagueness standard than are civil or economic regulations. [139] However, the doctrine does not require " 'meticulous specificity' " of statutes, recognizing that "language is necessarily marked by a degree of imprecision." [140]

▮▮▮ Because plaintiffs pursue this "pre-enforcement" appeal before they have been charged with any violation of law, it constitutes a "facial," rather than "as-applied," challenge. [141] Under the standard set forth by the Supreme Court in *United States v. Salerno*, to succeed on a facial challenge, "the challenger must establish that *no set of circumstances* exists under which the Act would be valid." [142] As a result, a facial challenge to a legislative enactment is "the most difficult challenge to mount successfully." [143]

Seeking to avoid this prohibitively high bar, plaintiffs urge us to follow the different approach that a plurality of the Supreme Court took in *City of Chicago v. Morales*. [144] In that case, three Justices held that a criminal law lacking a *mens rea* requirement and burdening a constitutional right "is subject to facial attack" "[w]hen vagueness permeates the text of such a law." [145] This Court, however, has determined that, because the test set forth by the *Morales* plurality has not been adopted by the Supreme Court as a whole, we are not required to apply it. [146] We have previously declined to specify a pref-

---

**137.** *Cramp v. Bd. of Pub. Instruction*, 368 U.S. 278, 287, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961); *see also Cunney v. Bd. of Trustees of Vill. of Grand View, N.Y.*, 660 F.3d 612, 620 (2d Cir. 2011).

**138.** *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983).

**139.** *Vill. of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982).

**140.** *Thibodeau v. Portuondo*, 486 F.3d 61, 66 (2d Cir.2007) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)).

**141.** *See Richmond Boro Gun Club, Inc. v. City of New York*, 97 F.3d 681, 685–86 (2d Cir. 1996).

**142.** 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (emphasis supplied).

**143.** *Id.*

**144.** 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999); *see also* Plaintiffs' Br., No. 14–319–cv, at 52–54; Plaintiffs' Br., No. 14–36–cv, at 52–56.

**145.** 527 U.S. at 55, 119 S.Ct. 1849.

**146.** *United States v. Rybicki*, 354 F.3d 124, 131–32 (2d Cir.2003) (en banc).

erence for either test,[147] and we need not do so here, because the challenged provisions are sufficiently clear to survive a facial challenge under either approach.

### b. Application

#### i. "Can be readily restored or converted to accept"

 Both the New York and Connecticut statutes criminalize the possession of magazines that "can be readily restored or converted to accept" more than ten rounds of ammunition.[148] In both suits, plaintiffs allege that the phrase is unconstitutionally vague because whether a magazine "can be readily restored or converted" depends upon the knowledge, skill, and tools available to the particular restorer, and the statutes are silent on these details.[149]

This statutory language dates at least to the 1994 federal assault-weapons ban and later appeared in New York's 2000 law. As Chief Judge Skretny noted, there is no record evidence that it has given rise to confusion at any time in the past two decades.[150] This Court found a similar phrase in another gun law—"may readily be converted"—to be "sufficiently definite" as to provide "clear[ ] warn[ing]" of its meaning.[151] Plaintiffs' reliance on a Sixth Circuit case that interpreted a *different* phrase—"may be restored" without the modifier "readily"—is inapposite.[152]

Plaintiffs' purported concern—that this provision might be unfairly used to prosecute an ordinary citizen for owning a magazine that only a gunsmith equipped with technical knowledge and specialized tools could "readily convert"[153]—is implausible. Should such a prosecution ever occur, the defendant could bring an "as applied" vagueness challenge, grounded in the facts and context of a particular set of charges. That improbable scenario cannot, however, adequately support the *facial* challenge plaintiffs attempt to bring here.

In sum, we affirm the judgments of both District Courts finding that this phrase is not unconstitutionally vague.

#### ii. Capacity of Tubular Magazines

The New York plaintiffs contend the SAFE Act's ten-round magazine restriction[154] is vague insofar as it extends to tubular magazines, the capacity of which varies according to the size of the particular shells that are loaded. This challenge fails as a threshold matter for the reasons stated by the District Court: the provision is only potentially vague when applied to a specific (non-standard) use, and hence is neither vague in all circumstances (as required under *Salerno*) nor permeated with vagueness (as required by the *Morales* plurality). Moreover, like the "readily converted" language, this capacity restriction was also included in the 1994 federal

---

147. *Id.* at 132 n. 3.

148. N.Y. Penal Law §§ 265.00(23), 265.02(8), 265.36; Conn. Gen.Stat. § 53–202w(a)(1).

149. Plaintiffs' Br., No. 14–36–cv, at 58–59; Plaintiffs' Br., No. 14–319–cv, at 58–60.

150. *NYSRPA,* 990 F.Supp.2d at 376.

151. *United States v. 16,179 Molso Italian .22 Caliber Winlee Derringer Convertible Starter Guns,* 443 F.2d 463, 464–65 (2d Cir.1971) (rejecting a vagueness challenge in a civil forfeiture context, and finding that the phrase

clearly meant a gun "which can be converted by a relatively simple operation taking only a few minutes").

152. Plaintiffs' Br., No. 14–36–cv, at 58; Plaintiffs' Br., No. 14–319–cv, at 58–59; *see Peoples Rights Org., Inc. v. City of Columbus,* 152 F.3d 522, 537 (6th Cir.1998).

153. *See* Plaintiffs' Br., No. 14–36–cv, at 58–59; Plaintiffs' Br., No. 14–319–cv, at 58–59.

154. N.Y. Penal Law § 265.00(23).

assault-weapons ban, without any record evidence of confusion during the ensuing decades.

### iii. "Copies or Duplicates"

█ Plaintiffs challenge the Connecticut statute's definition of assault weapon to include certain specified firearms and any "copies or duplicates thereof with the capability of" the listed models.[155] They argue that the provision provides inadequate notice of which firearms in particular are prohibited.

█ We review the statutory language within its context, relying if necessary on the canons of statutory construction and legislative history.[156] In the context of the legislation as a whole, this "copies or duplicates" language is not unconstitutionally vague. All firearms that the statute prohibits by model name *also* exhibit at least one of the prohibited military-style features.[157] Hence, the statute provides two independent means by which an individual may determine if his firearm is prohibited: he may consult the list of illegal models and, if still concerned that the firearm may be an unlawful "copy or duplicate," he may cross-reference the list of prohibited military-style features.

In this manner, the Connecticut legislation avoids the deficiency of an assault-weapons ban struck down by a sister Circuit as unconstitutionally vague in *Springfield Armory, Inc. v. City of Columbus.*[158] In *Springfield,* the municipal ordinance at issue defined assault weapons simply by naming 46 individual models and extending the prohibition to weapons with "slight modifications or enhancements" to the listed firearms. The Sixth Circuit explained that the ordinance was invalid because it "outlaw[ed] certain brand names without including within the prohibition similar assault weapons of the same type, function or capability [and] ... without providing any explanation for its selections [of prohibited firearms]."[159] The Sixth Circuit found it significant that the ordinance offered no "explanation for drafting the ordinance in terms of brand name rather than generic type or category of weapon."[160] In the instant case, by contrast, Connecticut has provided not only an itemized list of prohibited models but also the military-style features test, which functions as an explanation of the "generic type or category of weapon" outlawed.

We therefore agree with Judge Covello that the "copies or duplicate" provision of the Connecticut statute at issue here is sufficiently definite to survive a void-for-vagueness challenge.

### iv. "Version"

█ We apply similar logic to our analysis of New York's prohibition of semiautomatic pistols that are "semiautomatic version[s] of an automatic rifle, shotgun or firearm."[161] In this case, Chief Judge Skretny held that the provision was unconstitutionally vague, reasoning that "an or-

---

155. Conn. Gen.Stat. § 53–202a(1)(B)–(D).

156. *Commack Self–Service Kosher Meats, Inc. v. Hooker,* 680 F.3d 194, 213 (2d Cir.2012).

157. The Connecticut legislation prohibited only a single firearm, the Remington 7615, which lacked military-style features. Because we have already held that Connecticut's ban on the Remington 7615 is unconstitutional, *see ante* notes 73 and 112, plaintiffs' challenge to the "copies or duplicates" provision is moot regarding copies or duplicates of the Remington 7615 itself.

158. 29 F.3d 250, 252 (6th Cir.1994).

159. *Id.*

160. *Id.*

161. N.Y. Penal Law § 265.00(22)(c)(viii).

dinary person cannot know whether any single semiautomatic pistol is a 'version' of an automatic one." [162] The District Court also expressed concern that the lack of criteria might encourage arbitrary and discriminatory enforcement.[163]

We disagree. The SAFE Act's terminology has been used in multiple state and federal firearms statutes, including the 1994 federal assault-weapons ban, as well as in government reports, judicial decisions, and published books.[164] Plaintiffs have shown no evidence of confusion arising from this long-standing formulation. Though plaintiffs are correct that, as a general proposition, repetition does not save a vague term, in the particular circumstances presented here—repeated use for decades, without evidence of mischief or misunderstanding—suggests that the language is comprehensible. Further, the SAFE Act provides additional notice of prohibited conduct by requiring the creation of a website listing unlawful weapons and containing additional information.[165] If, in fact, as the District Court fears, this language results in arbitrary and discriminatory enforcement, those charged under the statute can and should seek recourse in an "as applied" challenge. We cannot conclude, however, that the provision is vague in all circumstances or permeated with vagueness on its face. We therefore reverse so much of the District Court's judgment as holds New York Penal Law § 265.00(22)(c)(viii) void because of vagueness.

### v. "Muzzle Break"

■ Finally, Chief Judge Skretny also struck down as impermissibly vague a provision of New York's SAFE Act that listed among prohibited military-style features such muzzle attachments as "a flash suppressor, *muzzle break*, muzzle compensator, or threaded barrel designed to accommodate a flash suppressor, *muzzle break*, or muzzle compensator." [166] All parties agree that a "muzzle *brake*" is a firearm attachment that reduces recoil. However, the SAFE Act misspelled the term as "muzzle *break*." On the basis of this misspelling, the District Court held the references to muzzle "breaks" to be unconstitutionally vague, reasoning that "an ordinary person cannot be 'informed as to what the State commands or forbids.' " [167]

This is, in our view, an overstatement. Because the misspelled homophone "muzzle break" has no accepted meaning, there is no meaningful risk that a party might confuse the legislature's intent. Further, its placement within a list of muzzle attachments makes the misspelled term's meaning even clearer. What is more, because the adjacent statutory term "muzzle compensator" is synonymous with muzzle brake, and thus independently covers the prohibited conduct, this issue is of little moment. Nonetheless, vagueness doctrine requires only that the statute provide "sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." [168]

**162.** *NYSRPA,* 990 F.Supp.2d at 377.

**163.** *Id.*

**164.** Defendants' Br., No. 14–36–cv, at 81–83.

**165.** N.Y. Penal Law § 400.00(16–a)(b). The New York State Police also maintains a telephone line to answer the questions of gun owners. *See* Defendants' Reply Br., No. 14–36–cv, at 26.

**166.** N.Y. Penal Law § 265.00(22)(a)(vi) (emphasis supplied).

**167.** *NYSRPA,* 990 F.Supp.2d at 377 (quoting *Cunney,* 660 F.3d at 620).

**168.** *United States v. Farhane,* 634 F.3d 127, 139 (2d Cir.2011) (internal quotation marks omitted).

This provision has done so. Accordingly, we reverse so much of the District Court's judgment as holds New York Penal Law § 265.00(22)(a)(vi) unconstitutionally vague.

## CONCLUSION

To summarize, we hold as follows:

(1) The core prohibitions by New York and Connecticut of assault weapons and large-capacity magazines do not violate the Second Amendment.

 (a) We assume that the majority of the prohibited conduct falls within the scope of Second Amendment protections. The statutes are appropriately evaluated under the constitutional standard of "intermediate scrutiny"—that is, whether they are "substantially related to the achievement of an important governmental interest."

 (b) Because the prohibitions are substantially related to the important governmental interests of public safety and crime reduction, they pass constitutional muster.

We therefore **AFFIRM** the relevant portions of the judgments of the Western District of New York and the District of Connecticut insofar as they upheld the constitutionality of state prohibitions on semiautomatic assault weapons and large-capacity magazines.

(2) We hold that the specific prohibition on the non-semiautomatic Remington 7615 falls within the scope of Second Amendment protection and subsequently fails intermediate scrutiny. Accordingly, we **REVERSE** that limited portion of the judgment of the District of Connecticut. In doing so, we emphasize the limited nature of our holding with respect to the Remington 7615, in that it merely reflects the presumption required by the Supreme Court in *District of Columbia v. Heller* that the Second Amendment extends to all bearable arms, and that the State, by failing to present any argument at all regarding this weapon or others like it, has failed to rebut that presumption. We do not foreclose the possibility that States could in the future present evidence to support such a prohibition.

(3) New York's seven-round load limit does not survive intermediate scrutiny in the absence of requisite record evidence and a substantial relationship between the statutory provision and important state safety interests. We therefore **AFFIRM** the judgment of the Western District of New York insofar as it held this provision unconstitutional.

(4) No challenged provision in either statute is unconstitutionally vague. Accordingly, we **AFFIRM** the judgments of the District of Connecticut and the Western District of New York insofar as they denied vagueness challenges to provisions involving the capacity of tubular magazines, "copies or duplicates," or a firearm's ability to "be readily restored or converted." We **REVERSE** the judgment of the Western District of New York insofar as it found language pertaining to "versions" and "muzzle breaks" to be unconstitutionally vague.