**19-620-cr**
*United States v. Perez*

# In the
# United States Court of Appeals
## For the Second Circuit

————

AUGUST TERM 2019

ARGUED: FEBRUARY 13, 2020
DECIDED: JULY 29, 2021

No. 19-620-cr

UNITED STATES OF AMERICA,
*Appellee,*

*v.*

JAVIER PEREZ,
*Defendant-Appellant.*

————

On Appeal from the United States District Court
for the Eastern District of New York.

————

Before: WALKER, CARNEY, and MENASHI,* *Circuit Judges.*

————

Defendant-Appellant Javier Perez appeals from a judgment of conviction for possessing a firearm and ammunition while unlawfully

---

* Circuit Judge Ralph K. Winter, originally a member of this panel, died on December 8, 2020. Circuit Judge Steven J. Menashi has replaced Judge Winter on the panel for this appeal. *See* 2d Cir. IOP E(b).

present in the United States. Perez challenges the statute of conviction, 18 U.S.C. § 922(g)(5), on the basis that it violates the Second Amendment right to bear arms by imposing a categorical bar on his ability to possess a firearm or ammunition. Assuming without deciding that, even as an undocumented alien, he is entitled to Second Amendment protection, we hold that 18 U.S.C. § 922(g)(5), as applied to Perez, withstands intermediate scrutiny. Accordingly, we **AFFIRM** the judgment of the district court (Carol B. Amon, *J.*) in its entirety.

Judge Menashi concurs in the judgment in a separate opinion.

————

Yuanchung Lee, Federal Defenders of New York, Inc., Appeals Bureau, *for Defendant-Appellant Javier Perez*.

Tanya Hajjar (Kevin Trowel, *on the brief*), Assistant United States Attorneys, *for* Mark J. Lesko, Acting United States Attorney for the Eastern District of New York, *for Appellee*.

————

JOHN M. WALKER, JR., *Circuit Judge*:

Defendant-Appellant Javier Perez appeals from a judgment of conviction for possessing a firearm and ammunition while unlawfully present in the United States. Perez challenges the statute of conviction, 18 U.S.C. § 922(g)(5), on the basis that it violates the Second Amendment right to bear arms by imposing a categorical bar on his ability to possess a firearm or ammunition. Assuming without deciding that, even as an undocumented alien, he is entitled to Second Amendment protection, we hold that 18 U.S.C. § 922(g)(5), as applied to Perez, withstands intermediate scrutiny. Accordingly, we **AFFIRM** the judgment of the district court (Carol B. Amon, *J.*) in its entirety.

## BACKGROUND

Javier Perez was born in rural Mexico in 1989 and entered the United States without authorizing documents at the age of 13. From that time until his arrest in 2018, he was self-employed as a carpenter. After residing with relatives in Brooklyn, New York for several years, he eventually secured his own apartment. Perez became involved with the Ninos Malos gang in his youth, but asserts that he has not been a member since 2012. In or around 2017, he moved to New Haven, Connecticut to live with his girlfriend and her young son. He has two children, who were born in the United States and are living with their mother in Brooklyn, and whom he visits and helps support financially.

The Offense Conduct

On July 23, 2016, Perez was attending a barbeque in the Sunset Park neighborhood of Brooklyn when a violent fight broke out down the street. Several young men wielding bats and machetes were attacking a member of a rival gang. At some point during the fight, Perez borrowed a firearm from an acquaintance, approached the fight, and fired several shots into the air. Hearing the gunshots, the young men scattered, and Perez returned to the barbeque and gave the gun back to his acquaintance.

A few days later, the New York Police Department (NYPD) obtained a video recording of the incident that showed the shooter to be a man later identified as Perez. The NYPD identified the firearm as a .380 caliber Davis Industries semiautomatic pistol by matching its shell casing to that of a gun used in a subsequent shooting on October 8, 2016, also in Brooklyn. In April 2017, after Perez was arrested by NYPD officers for a separate offense, he admitted to being the shooter at the July 23, 2016 incident and that he had borrowed and fired the gun to intimidate the gang members. When he fired the gun, he was unlawfully present in the United States.

Procedural History

On April 30, 2018, a grand jury indicted Perez on possession of a firearm and ammunition while being an alien illegally and unlawfully in the United States, in violation of 18 U.S.C. § 922(g)(5). Perez moved to dismiss the indictment, arguing that § 922(g)(5) on its face violated the Second Amendment by erecting a categorical bar on

the possession of firearms by illegal or unlawful aliens. The district court denied the motion to dismiss the indictment. Assuming without finding that the Second Amendment affords constitutional protection to undocumented aliens, the district court concluded that § 922(g)(5) survives intermediate scrutiny and thus is constitutional. Perez entered a conditional plea of guilty that preserved his right to challenge § 922(g)(5) under the Second Amendment, and was sentenced to 20 months' imprisonment and 3 years' supervised release. This appeal followed.

## DISCUSSION

The sole issue on appeal is whether 18 U.S.C. § 922(g)(5) as applied to Perez violates the Second Amendment. Section 922(g)(5) prohibits "an alien . . . illegally or unlawfully in the United States" from "possess[ing] . . . any firearm or ammunition" in or affecting commerce.[1] We employ a two-step framework to determine the constitutionality of a restriction on firearms: (1) we assess whether the law burdens conduct protected by the Second Amendment; (2) we

---

[1] The government argues that Perez waived his as-applied challenge to the constitutionality of § 922(g)(5) because he raised solely a facial challenge in the district court. We previously treated a defendant's facial challenge to a related provision, § 922(g)(6), which prohibits firearm possession by one who has been dishonorably discharged from the military, as an as-applied challenge, even though the defendant raised arguments only as to the provision's facial invalidity in the district court and on appeal. *See United States v. Jimenez*, 895 F.3d 228, 232 (2d Cir. 2018). Consistent with that approach, we consider here whether § 922(g)(5) is unconstitutional as applied to Perez.

determine and apply the appropriate level of scrutiny.[2] We review *de novo* the district court's decision that the statute was constitutional as applied.[3]

**I.      Whether the Second Amendment Applies to Perez**

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." Perez argues that "the people" includes aliens like him, who are present unlawfully but have developed substantial connections to the country. We have not decided whether the Second Amendment protects undocumented immigrants.

The Supreme Court outlined the contours of the Second Amendment in the seminal decision, *District of Columbia v. Heller*.[4] Based on extensive historical analysis, *Heller* broadly declared that the Second Amendment confers a right to bear arms while leaving details of the right to further adjudication. *Heller* read the Second Amendment to codify a preexisting right for the individual to "possess and carry weapons in case of confrontation."[5] That right, however, does not extend to the "carry[ing] [of] arms for *any sort* of

---

[2] *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 253 (2d Cir. 2015) (*NYSRP*).

[3] *Id.* at 252 (internal quotation marks and citation omitted).

[4] 554 U.S. 570 (2008).

[5] *Id.* at 592.

confrontation."[6]  Noting that the right is "not unlimited,"[7] the Court considered the scope of the Second Amendment along two dimensions:  what types of "arms" are protected and who are among "the people."  First, the Second Amendment protects the sorts of weapons that were "in common use at the time" that were typically owned by "law-abiding citizens for lawful purposes."[8]  This right, of law-abiding persons to protect themselves and family members in the home using a weapon in common use, is "the *central component*" guaranteed by the Second Amendment.[9]

Second, *Heller* suggested that "the people" in the text of the Second Amendment is a term of art that refers to members of the "political community."[10]  *Heller* relied on the Supreme Court's prior decision in *United States v. Verdugo-Urquidez*,[11] which examined the Fourth Amendment's reference to "the people," and opined: "[Its uses] suggest[] that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, . . . refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."[12]  Based on this reading of "the people," we

---

[6] *Id.* at 595.

[7] *Id.*

[8] *Id.* at 624, 627.

[9] *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (quoting *Heller*, 554 U.S. at 599); *see also id.* at 780.

[10] *Heller*, 554 U.S. at 580.

[11] 494 U.S. 259 (1990).

[12] *Heller*, 554 U.S. at 580 (citing *Verdugo-Urquidez*, 494 U.S. at 265).

have previously concluded that, "[a]lthough the [*Heller*] Court uses 'citizens', presumably at least some non-citizens are covered by the Second Amendment."[13]  For example, permanent resident aliens who are law-abiding, pay taxes, and contribute to political campaigns have established connections with this country that may qualify them to be among "the people" who have a Second Amendment right.[14]

Relying on *Heller* and *Verdugo-Urquidez*, Perez argues that he is among "the people" who possess a right to bear arms because he has developed "sufficient connection[s] with" the United States, having lived continuously in this country for the fifteen years preceding his arrest.  This analysis oversimplifies a question of some complexity. *Heller* and *Verdugo-Urquidez* suggested that a person may be among "the people" if he has developed connections with the United States, but that those connections must be sufficiently great to qualify him as a member of the "national" or "political" community.  While Perez appears to have put down roots in this country through years of steady employment and a familial and social network, his status as an unlawfully present alien necessarily makes him ineligible to vote or hold certain government offices and subjects him to deportation at any time.  Excluded from participation in our democratic political institutions, it is uncertain whether he can qualify as being part of the

---

[13] *Jimenez*, 895 F.3d at 233 n.1.

[14] *See Verdugo-Urquidez*, 494 U.S. at 271 (collecting cases recognizing constitutional rights of resident aliens).

"national" or "political" community.[15] Regardless, reaching this issue here risks "introducing difficult questions into our jurisprudence,"[16] such as how "the people" in this context coheres with different but related designations in other enumerated rights. For example, "person," as used in the Fifth and Fourteenth Amendments, has "long been recognized" to include unlawful aliens and confer on them due process rights.[17]

Taking a different approach to the question, various of our sister courts have read *Heller* to exclude entirely from the Second Amendment groups who have defied the law or are otherwise "unvirtuous."[18] *Heller* identified the right of "law-abiding, responsible" persons to keep arms to be at the heart of the Second Amendment, and validated "longstanding prohibitions on the possession of firearms by felons and the mentally ill."[19] Although *Heller* itself left open whether certain groups are wholly excluded from the Second Amendment's protections or, instead, have a right that legislatures may severely restrict, some circuits have relied on the foregoing passages in *Heller* to conclude that undocumented aliens like Perez are not entitled to Second Amendment protections because

---

[15] *Cf. Sugarman v. Dougall*, 413 U.S. 634, 647 (1973) (describing a political community as based in part on who can vote and hold certain state positions that perform functions going to "the heart of representative government").

[16] *Jimenez*, 895 F.3d at 234.

[17] *Plyler v. Doe*, 457 U.S. 202, 210 (1982).

[18] *Jimenez*, 895 F.3d at 233 (collecting cases from the Third, Fourth, Eighth, Ninth, and Eleventh Circuits).

[19] *Heller*, 554 U.S. at 626.

they are not "law-abiding."[20]  Yet other circuits have held or assumed that unauthorized aliens are included in "the people" but concluded that § 922(g)(5) is a permissible restriction.[21]

Our court has declined to address the extent to which the Second Amendment protects conduct or individuals beyond the core guarantee of a law-abiding person's right to keep firearms for self-defense.[22]  Recognizing that *Heller* left a "vast *terra incognita*" as to what conduct or characteristics disqualify a person from the Second Amendment's protections,[23] our practice in those cases has been to assume that a given firearm restriction implicates rights guaranteed by the Second Amendment and determine whether the restriction would nonetheless withstand the appropriate level of scrutiny.[24]  We see no reason to abandon that approach here.  Deciding whether undocumented immigrants like Perez have a constitutional right to possess firearms "risks introducing difficult questions into our

---

[20] *United States v. Carpio-Leon*, 701 F.3d 974, 979–81 (4th Cir. 2012); *United States v. Portillo-Munoz*, 643 F.3d 437, 440 (5th Cir. 2011), *as revised* (June 29, 2011); *United States v. Flores*, 663 F.3d 1022 (8th Cir. 2011) (per curiam).

[21] *United States v. Meza-Rodriguez*, 798 F.3d 664, 666, 672 (7th Cir. 2015) (holding); *United States v. Torres*, 911 F.3d 1253, 1261 (9th Cir. 2019) (assuming without deciding); *United States v. Huitron-Guizar*, 678 F.3d 1164, 1169 (10th Cir. 2012) (assuming without deciding).

[22] *See NYSRP*, 804 F.3d at 257; *Jimenez*, 895 F.3d at 233–34.

[23] *Jimenez*, 895 F.3d at 234 (quoting *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012)).

[24] *Id.*

jurisprudence, including questions that have divided other courts."[25] We need not decide the question here, because even if we were to assume that Perez has a constitutional right to possess firearms, we find that § 922(g)(5) is a permissible restriction when applied to the facts of this case.

## II.    Determining and Applying the Requisite Level of Scrutiny

We first determine the appropriate level of scrutiny to apply to § 922(g)(5).  Generally, courts apply one of three levels of scrutiny to evaluate whether a law is constitutional:  strict scrutiny, intermediate scrutiny, or rational basis review.  Under strict scrutiny, the most demanding standard, the government must demonstrate that the challenged law serves a compelling governmental interest and is narrowly tailored to achieve that interest.[26]  Intermediate scrutiny is less demanding, requiring only that the law be "substantially related to the achievement of an important governmental interest."[27]  The most lenient standard, rational basis review, asks whether the law is rationally related to a legitimate governmental purpose.[28]  *Heller* cautioned that a restriction on Second Amendment rights requires heightened scrutiny beyond rational basis.[29]

---

[25] *Id.* (citing *Binderup v. Att'y Gen. United States of Am.*, 836 F.3d 336 (3d Cir. 2016), and *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678 (6th Cir. 2016)).

[26] *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003).

[27] *NYSRP*, 804 F.3d at 261 (quoting *Kachalsky*, 701 F.3d at 96).

[28] *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

[29] *Heller*, 554 U.S. at 628 n.27.

We determine whether a restriction on firearms is examined under strict or intermediate scrutiny based on two factors: "(1) how close the law comes to the core of the Second Amendment right and (2) the severity of the law's burden on the right."[30] "[L]aws that place either insubstantial burdens on conduct at the core of the Second Amendment or substantial burdens on conduct outside the core of the Second Amendment . . . can be examined using intermediate scrutiny."[31] Only restrictions that substantially burden core rights trigger strict scrutiny.[32]

*Heller* identified as at the core of the Second Amendment "the right of law-abiding, responsible citizens to use arms" in self-defense in the home.[33] We have also emphasized that whether the possessor is "law-abiding and responsible" is critical to determining whether an interest falls within the core right.[34] In *United States v. Jimenez*, we upheld an analogous provision that banned the possession of guns by those who were dishonorably discharged from the military on the basis that such individuals generally have been convicted of felony-equivalent conduct.[35] To determine the burden imposed by a restriction on the possession of firearms, we consider the scope of the

---

[30] *NYSRP*, 804 F.3d at 258 (internal quotation marks and citation omitted).

[31] *Jimenez*, 895 F.3d at 234.

[32] *Id.*

[33] *See Heller*, 554 U.S. at 635.

[34] *Jimenez*, 895 F.3d at 235; *see also United States v. Bryant*, 711 F.3d 364, 369 (2d Cir. 2013) (per curiam).

[35] *Jimenez*, 895 F.3d at 236–37.

restriction and the extent to which adequate alternatives remain for persons who are law-abiding to acquire a firearm for self-defense.[36]

Section 922(g)(5) erects a categorical ban on the possession of firearms by undocumented immigrants like Perez, and thus imposes a substantial burden on his ability to bear arms. Indeed, this burden is insurmountable as long as his presence in the country is unlawful. His interest in simply possessing firearms, however, is not at the core of the Second Amendment right identified in *Heller*. As noted above, *Heller* identified the core interest of the right as self-defense in the home. Here, Perez's possession was neither in self-defense nor in the home. While outdoors, he quickly took a weapon not his own, charged down a residential street towards a gang fight, and shot the weapon several times in the air.

Perez also does not qualify as a "law-abiding, responsible citizen[]" because, however he may choose to live his life in the United States, his presence here is unlawful. Perez asserts that his undocumented status, without more, is not a crime and, unlike the defendant in *Jimenez*, he had no criminal history prior to this conviction. But Perez cannot reasonably dispute that he entered this country without authorization, has continued to remain without complying with established laws and procedures applicable to immigrants, and therefore is subject to deportation. We do not consider Perez's interest in possessing guns at all similar to that of a "law-abiding, responsible" person pursuing self-defense. We agree

---

[36] *NYSRP*, 804 F.3d at 259.

with the district court that, as applied to Perez, § 922(g)(5) does not implicate conduct at the core of the Second Amendment and thus conclude that intermediate scrutiny applies.

To withstand intermediate scrutiny, the law must be "substantially related to the achievement of an important governmental interest."[37] We have observed that regulation of firearms "has always been more robust" than governmental measures affecting other constitutional rights.[38] Thus, our only role is to ensure that Congress formulated the challenged regulation "based on substantial evidence."[39] Perez concedes that public safety in the context of using firearms is an important governmental objective. We turn our attention, then, to whether § 922(g)(5) bears a substantial relation to the achievement of that objective and conclude that it does.

The government supplies three principal rationales for the ends served by § 922(g)(5), each of which we find furthers public safety: (1) preventing individuals who live outside the law from possessing guns, (2) assisting the government in regulating firearm trafficking by preventing those who are beyond the federal government's control from distributing and purchasing guns, and (3) preventing those who have demonstrated disrespect for our laws from possessing firearms. Based on all three rationales, we conclude that § 922(g)(5) is

---

[37] *Id.* at 261 (quoting *Kachalsky*, 701 F.3d at 96).

[38] *Kachalsky*, 701 F.3d at 100.

[39] *Id.* at 97 (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 666 (1994)) (internal quotation marks omitted).

substantially related to the government's interest in promoting public safety with respect to the use of firearms.

First, it can hardly be disputed that, simply by virtue of their status, undocumented immigrants largely "liv[e] outside the law" in at least that one fundamental respect and sometimes more.[40]  By not taking part in all formal systems of registration, identification, or employment that the law requires, undocumented aliens are "harder to trace"[41] and thus their behavior is harder to regulate in some respects.  Perez's arguments, that he did not assume a false identity and that certain jurisdictions issue driver's licenses regardless of immigration status, carry little weight.  It remains that Perez has never filed federal tax returns or had a social security number, and there is no indication that he was ever employed "on the books."

Second, by prohibiting unlawful immigrants like Perez from possessing lethal weapons, § 922(g)(5) furthers Congress's interest in regulating interstate commerce in firearms for the purpose of investigating, tracking, and preventing gun violence.  "When Congress enacted [18 U.S.C. § 921 *et seq.*], it was concerned with the widespread traffic in firearms,"[42] having found that the United States had "become the dumping ground of the castoff surplus military

---

[40] *United States v. Toner*, 728 F.2d 115, 129 (2d Cir. 1984).
[41] *United States v. Torres*, 911 F.3d 1253, 1264 (9th Cir. 2019).
[42] *Huddleston v. United States*, 415 U.S. 814, 824 (1974).

weapons of other nations."[43]  While the federal  firearm regulatory regime covers manufacturers and importers, wholesalers, and retailers, the secondary market of private sales is largely unregulated.[44] Firearms transferred even once by an unlicensed seller and later used in a crime are "generally impossible" for law enforcement to trace.[45]  The secondary market of private transactions has also been a substantial source of guns diverted to the illegal market.[46]  Born of a fear that their immigration status could be discovered, unauthorized aliens seeking to procure a firearm may be especially attracted to purchasing on the secondary market, where sellers are not required to conduct background checks or maintain transfer records under federal law.[47]  Section 922(g)(5) thus aids Congress's efforts in suppressing the illicit market in firearms and regulating interstate commerce in firearms.

---

[43] Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, § 901(a)(7), 82 Stat. 226 (1968).[44] *Abramski v. United States*, 573 U.S. 169, 185 (2014).

[44] *Abramski v. United States*, 573 U.S. 169, 185 (2014).

[45] Bureau of Alcohol, Tobacco, & Firearms, Youth Crime Gun Interdiction Initiative, *Crime Gun Trace Reports* (2000) 29 (July 2002), https://www.atf.gov/file/2176/download.

[46] Bureau of Alcohol, Tobacco, & Firearms, Youth Crime Gun Interdiction Initiative, *Performance Report for the Senate and House Committees on Appropriations Pursuant to Conference Report 105-825* 6 (Feb. 1999), https://www.atf.gov/file/5601/download.

[47] *See Abramski*, 573 U.S. at 180–81 (discussing why an individual prohibited from owning firearms might send a straw purchaser to buy a firearm on his behalf).

Third, the government has an obvious interest in prohibiting the possession of firearms by those who are not, as *Heller* put it, "law-abiding." Congress has every right to "conclude[] that those who show a willingness to defy our law are candidates for further misfeasance or at least a group that ought not be armed when authorities seek them."[48] Perez does not dispute that he has continuously failed to be "law-abiding" by remaining in this country without authorization, even though he may have lacked criminal intent as a minor entering the country. As to Perez's assertion that § 922(g)(5) is overbroad, we acknowledge that many undocumented immigrants have never committed a crime of violence and that many could be trusted with a firearm. But the same can be said for felons and people with a mental illness who have not committed a violent offense, groups also barred from possessing firearms. Congress is "better equipped than the judiciary to make sensitive public policy judgments" regarding the dangers posed by firearm possession and how to mitigate those risks.[49] The legislative measures it enacts to reduce those dangers, such as § 922(g)(5), need not be the least restrictive means of achieving that objective when reviewed under intermediate scrutiny.[50] Accordingly, we conclude that § 922(g)(5) does not substantially burden any Second Amendment right to bear arms that is particularized to Perez.

---

[48] *United States v. Huitron-Guizar*, 678 F.3d 1164, 1170 (10th Cir. 2012).

[49] *NYSRP*, 804 F.3d at 261 (internal quotation marks omitted) (quoting *Kachalsky*, 701 F.3d at 97).

[50] *Id.*

**CONCLUSION**

For the foregoing reasons, we AFFIRM the district court's decision in full.

MENASHI, *Circuit Judge*, concurring in the judgment:

In today's opinion, the court declines to hold that illegal aliens lack the protection of the Second Amendment. The court holds instead that because illegal aliens have engaged in unlawful conduct, the government has an important interest in preventing them from possessing firearms and that courts should defer to Congress's public policy judgments about how best to do so. In a roundabout way, therefore, the court arrives at the conclusion that illegal aliens lack the protection of the Second Amendment. *See ante* at 16-17 (noting that illegal aliens "fail[] to be 'law-abiding' by remaining in this country without authorization" and that "the government has an obvious interest in prohibiting the possession of firearms by those who are not … 'law-abiding'"). By reaching this conclusion indirectly instead of directly, however, the court undermines the protections of the Second Amendment for American citizens by watering down the intermediate scrutiny the court purportedly applies to the challenged restriction into a form of rational basis review.

In *Heller*, the Supreme Court spoke of "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). As the court recognizes, illegal aliens are "[e]xcluded from participation in our democratic political institutions." *Ante* at 8. This is not simply a matter of whether illegal aliens fail to be "law-abiding" and "responsible." It means they are not "citizens"—"members of the political community" to whom "'the right of the people to keep and bear Arms'" belongs. *Heller*, 554 U.S. at 576, 580 (quoting U.S. Const.

amend. II). The court strains to avoid this key point from *Heller*.[1] I would instead join those circuits that have straightforwardly concluded that illegal aliens cannot invoke the right of the people to keep and bear arms under the Second Amendment. I concur only in the judgment.

## I

As an initial matter, I disagree with the court's reasons for applying intermediate scrutiny to Perez's claim. The court contends that Perez's "interest in simply possessing firearms … is not at the core of the Second Amendment right identified in *Heller*" because "*Heller* identified the core interest of the right as self-defense in the home" and "Perez's possession was neither in self-defense nor in the home." *Ante* at 13. Rather, "[w]hile outdoors, [Perez] quickly took a weapon not his own, charged down a residential street towards a gang fight, and shot the weapon several times into the air." *Id.* The court concludes from these circumstances that Perez's interest in

---

[1] The court repeatedly truncates quotations or paraphrases *Heller* to replace the word "citizens" with "persons." *See ante* at 7 (noting that the right "of law-abiding persons to protect themselves and family members in the home" is "'the *central component*' guaranteed by the Second Amendment"); *id.* at 9 ("*Heller* identified the right of 'law-abiding, responsible' persons to keep arms to be at the heart of the Second Amendment."); *id.* at 10 (identifying "the core guarantee of a law-abiding person's right to keep firearms for self-defense"); *id.* at 13 (considering whether "alternatives remain for persons who are law-abiding to acquire a firearm for self-defense"); *id.* at 13 (comparing "Perez's interest in possessing guns" with "that of a 'law-abiding, responsible' person pursuing self-defense"); *id.* at 16 (discussing "those who are not, as *Heller* put it, 'law-abiding'"). Because the court makes so much of the words "law-abiding" and "responsible" in the *Heller* opinion, it is striking how much work it does to ignore the word that immediately follows.

possessing firearms is "not … at all similar to that of a 'law-abiding, responsible' person pursuing self-defense" and therefore "does not implicate conduct at the core of the Second Amendment." *Id.* at 13-14.

This explanation fails to account for the fact that Perez took possession of and fired the gun to deter "a group of kids with bats and machetes [who] were attacking a boy from a rival gang," Appellant's Br. 4; *see* App'x 88, and thus used the gun in defense of another. The law generally draws no distinction between the use of force in defense of self and in defense of others. *See, e.g.*, N.Y. Penal Law § 35.15 ("A person may … use physical force upon another person when and to the extent he or she reasonably believes such to be necessary to defend himself, herself *or a third person* from what he or she reasonably believes to be the use or imminent use of unlawful physical force by such other person.") (emphasis added); *People v. Hernandez*, 98 N.Y.2d 175, 179-80 (2002) ("[Section 35.15] reflects the principle, first established under the common law and long recognized by statute, that deadly physical force may be justified—with no criminal liability—if the deadly force was used in self-defense *or in defense of others*.") (emphasis added).

I would not import such a novel distinction into the "core" of the Second Amendment. *Heller* does not suggest that there is a distinction between self-defense and defense of others for the purposes of the Second Amendment. To the contrary, *Heller* emphasizes the right to keep and bear arms "for protection of one's home *and family*," which does not limit the core of the right to defense only of oneself. 554 U.S. at 628-29 (emphasis added).

Accordingly, I would not conclude that Perez's claim falls outside of the core of the Second Amendment right because he acted in defense of another rather than himself.

**II**

Because Perez used a firearm in defense of another, the only basis for holding that he falls outside the core of the Second Amendment is his immigration status. As the opinion notes, there is a strong argument that Perez's disqualification from public life and lack of authorization to reside in the United States means he is outside the "political community" and therefore "the people" to whom the right to keep and bear arms belongs. *Ante* at 7-9; *see Heller*, 554 U.S. at 580. The court declines to reach this conclusion directly, however, explaining that to do so would "risk[] 'introducing difficult questions into our jurisprudence,' such as how 'the people' in this context coheres with different but related designations in other enumerated rights." *Ante* at 9 (quoting *United States v. Jimenez*, 895 F.3d 228, 234 (2d Cir. 2018)). Instead, the court reaches the same result indirectly by holding that illegal aliens are outside the core of the Second Amendment because they have acted unlawfully, that the government has an important interest in preventing people who act unlawfully from possessing firearms, and that courts should defer to Congress's "sensitive public policy judgments" about how to do so. *Id.* at 13-17.

The upshot is that illegal aliens have no meaningful rights under the Second Amendment. The problem is that by reaching this conclusion indirectly instead of directly, the court—while purporting to apply intermediate scrutiny—affords so much deference to legislative judgments about restricting gun ownership as to subject

4

such restrictions only to rational basis review. The court even concedes that a categorical ban on illegal aliens owning firearms is "overbroad" because "many undocumented immigrants have never committed a crime of violence and … could be trusted with a firearm." *Id.* at 17. Thus, we have an approach under which those protected by the Second Amendment and who "have never committed a crime of violence" and "could be trusted with a firearm" could nevertheless be deprived of their Second Amendment rights. *Id.* This approach risks undermining the Second Amendment across the board.

Unlike rational basis review, which is "indulgent and respectful," *Winston v. City of Syracuse*, 887 F.3d 553, 560 (2d Cir. 2018), intermediate scrutiny must be "sufficiently skeptical and probing to provide the rigorous protection that constitutional rights deserve," *Ramos v. Town of Vernon*, 353 F.3d 171, 181 (2d Cir. 2003). Yet the court upholds a categorical ban on firearm ownership by affording deference to the exercise of Congress's power "to make sensitive public policy judgments" based on facts that it had "every right to conclude" were true—but, as far as the court is concerned, might very well be false. *Ante* at 16-17 (internal quotation marks and alteration omitted); *see also id.* at 16 (noting that "unauthorized aliens seeking to procure a firearm *may be* especially attracted to purchasing on the secondary market") (emphasis added). Far from "skeptical and probing," *Ramos*, 353 F.3d at 181, the court's deferential posture resembles rational basis review rather than intermediate scrutiny. *See Armour v. City of Indianapolis*, 566 U.S. 673, 681 (2012) (explaining that under rational basis review, "a law [is] constitutionally valid if 'there is a plausible policy reason for the [law], the legislative facts on which the [law] is apparently based rationally may have been considered to

5

be true by the governmental decisionmaker, and the relationship of the [law] to its goal is not so attenuated as to render [it] arbitrary or irrational'").

To the extent that the court purports to apply intermediate scrutiny, its analysis falls short. Under intermediate scrutiny, the government bears the burden to "show that the challenged legislative enactment is substantially related to an important governmental interest." *Ramos*, 353 F.3d at 175. In the court's view, the government has carried this burden because the challenged restriction "furthers Congress's interest in regulating interstate commerce in firearms." *Ante* at 15-16. But regulating the very conduct protected by a constitutional right is not "an important governmental interest" that can withstand intermediate scrutiny. *Ramos*, 353 F.3d at 175. And if the government's "interest in regulating interstate commerce in firearms" is sufficient to satisfy intermediate scrutiny, *ante* at 15-16, then intermediate scrutiny has become meaningless in the Second Amendment context because any restriction on gun ownership will be "substantially related to" that interest, *Ramos*, 353 F.3d at 175.

The court identifies other important governmental interests that support the challenged restriction—such as "preventing gun violence," *ante* at 15—but the court simply accepts the government's assertions about those interests without scrutiny. For example, the court states that "[t]he secondary market of private transactions has … been a substantial source of guns diverted to the illegal market" and that illegal aliens "may be especially attracted to purchasing on the secondary market." *Id.* at 16. The court makes no effort to consider whether evidence supports this claim about the "secondary market" or whether the court's speculation about the relationship between illegal aliens and that market has any basis in fact. The court also fails

to analyze whether barring illegal aliens from owning firearms has actually "aid[ed] Congress's efforts in suppressing the illicit market in firearms," *id.*, or whether "the Government can achieve its legitimate objectives in less restrictive ways," *United States v. Alvarez*, 567 U.S. 709, 730 (2012) (Breyer, J., concurring in the judgment).

This sort of perfunctory analysis, accepting speculation in place of record evidence, does not amount to intermediate scrutiny. Under intermediate scrutiny, "we have an independent duty to identify with care the Government interests supporting the scheme, to inquire into the reasonableness of congressional findings regarding its necessity, and to examine the fit between its goals and its consequences." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 229 (1997) (O'Connor, J., dissenting). By accepting the government's assertions without requiring support, the court shirks this duty.

The court fares no better with respect to its argument that "the government has an obvious interest in prohibiting the possession of firearms by those who are not … 'law-abiding.'" *Ante* at 16. Under our precedents, whether the individual subject to the challenged firearm restriction is "law-abiding" determines the level scrutiny we apply; it does not also determine whether the challenged restriction survives that scrutiny. *See Jimenez*, 895 F.3d at 234-36. Indeed, the court decides to apply intermediate scrutiny to Perez in part because he "does not qualify as … law-abiding" due to his "unlawful" presence in the country. *Ante* at 13-14 (internal quotation marks omitted). Yet the court then relies on that same justification to hold that intermediate scrutiny is *satisfied*. *See id.* at 16-17. The court's application of intermediate scrutiny thus plays no role in its decision: the same reason intermediate scrutiny applies is the reason that such scrutiny is overcome, and therefore the court knows before it applies any

7

scrutiny at all that the challenged restriction will survive. Moreover, because Perez's *immigration status* both determines the level of scrutiny and satisfies that scrutiny, the court ultimately arrives at the conclusion it strains to avoid: illegal aliens—by virtue of their immigration status alone—are not protected under the Second Amendment.[2]

The court's opinion, however, is not limited to illegal aliens. Because the court collapses Perez's immigration status into a larger category of people who are not "law-abiding," the court suggests that anyone who falls into this broad and ill-defined category may be subjected to a ban on firearms possession. I have no doubt that the government has a "substantial, indeed compelling, … interest[] in public safety and crime prevention." *Kachalsky v. County of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012). That interest might justify restrictions on firearms possession for those properly determined to be dangerous or violent in light of "the time-honored principle that the right to keep and bear arms does not extend to those likely to commit violent offenses." *Binderup v. Att'y Gen.*, 836 F.3d 336, 367 (3d Cir. 2016) (Hardiman, J., concurring in part and concurring in the judgments); *see also Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting) ("History is consistent with common sense: it

---

[2] It is no answer that the court also relies on Congress's "public policy judgment[]"that illegal aliens should not be allowed to own firearms in upholding the challenged restriction. *Ante* at 17. "The very enumeration of the right" is supposed to "take[] out of the hands of government … the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634. Yet the court holds that Congress can bar illegal aliens from owning firearms *due to their immigration status alone*. The court's opinion thus does not treat illegal aliens as possessing any rights under the Second Amendment.

8

demonstrates that legislatures have the power to prohibit dangerous people from possessing guns.").

But Perez has not been convicted of—or even charged with—any violent crime. He says that he "had no criminal history prior to this conviction," and the court does not dispute that assertion. *Ante* at 13; *see* Appellant's Br. 4 n.2 (stating that Perez "had zero criminal history points" for the purposes of sentencing). Under the court's logic, therefore, a person who has "never committed a crime of violence and … could be trusted with a firearm" but commits a single non-violent offense, *ante* at 17, may be divested of all rights under the Second Amendment. The court's apparent comfort with this result "treat[s] the right recognized in *Heller* as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010); *see also Kanter*, 919 F.3d at 451 (Barrett, J., dissenting) ("[T]he power to prohibit dangerous people from possessing guns … extends only to people who are *dangerous*.").

### III

Rather than reach the conclusion that illegal aliens lack Second Amendment rights through excessive deference to Congress's "sensitive public policy judgments," *ante* at 17, I would join those circuits that have held that illegal aliens are not among "the people" to whom the right to keep and bear arms under the Second Amendment belongs. *See United States v. Carpio-Leon*, 701 F.3d 974, 979 (4th Cir. 2012) ("[I]llegal aliens do not belong to the class of law-abiding members of the political community to whom the Second Amendment gives protection."); *United States v. Flores*, 663 F.3d 1022, 1023 (8th Cir. 2011) (per curiam) ("[T]he protections of the Second

Amendment do not extend to aliens illegally present in this country."); *United States v. Portillo-Munoz*, 643 F.3d 437, 442 (5th Cir. 2011) ("Whatever else the term means or includes, the phrase 'the people' in the Second Amendment of the Constitution does not include aliens illegally in the United States.").

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. By protecting the right of "the people," the Second Amendment "is distinguishable from the Fifth and Fourteenth Amendments, which provide protections to 'persons.'" *Carpio-Leon*, 701 F.3d at 978. As the Supreme Court has explained, the phrase "the people" is "a term of art employed in select parts of the Constitution … [that] refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990). In *Heller*, the Supreme Court emphasized that "the people" within the context of the Second Amendment "unambiguously refers to all *members of the political community*." 554 U.S. at 580 (emphasis added).

The Court emphasized this conception of "the people" throughout *Heller*, which "frequently connect[s] arms-bearing and 'citizenship.'" *Carpio-Leon*, 701 F.3d at 978. That connection is unsurprising because the Second Amendment, while "not limited to the carrying of arms in a militia," is rooted in the "right of *citizens* to 'bear arms in defense of themselves and the state.'" *Heller*, 554 U.S. at 584-86 (emphasis added). While *Heller* held that the Second Amendment protects "an individual right to keep and bear arms," the *Heller* Court tied that right to citizenship, explaining that the Second

Amendment "elevates above all other interests the right of law-abiding, responsible *citizens* to use arms in defense of hearth and home." *Id.* at 595, 635 (emphasis added).[3]

That the Second Amendment codifies a right belonging to members of the political community is further confirmed by examining its historical antecedents and the practice of "founding-era legislatures." *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting). In colonial America, the right to keep and bear arms "did not extend to all New World residents." Joyce Lee Malcolm, To Keep and Bear Arms: The Origins of an Anglo-American Right 140 (1996). While "[a]lien men … could speak, print, worship, enter into contracts, hold personal property in their own name, sue and be sued, and exercise sundry other civil rights," they "typically could not vote, hold public office, or serve on juries" and did not have "the right to bear arms" because these "were rights of members of the polity." Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction 48 (1998).[4] Consistent with that understanding, both Massachusetts and Virginia made it a crime to arm American Indians who, "[a]s non-citizens, … were neither expected, nor usually allowed, to participate in the militia." Malcolm, *supra*, at 140. As non-citizens, American Indians

---

[3] The court quotes dicta from our decision in *United States v. Jimenez* to the effect that "[a]lthough the [Supreme] Court uses 'citizens' [in *Heller*], presumably at least some non-citizens are covered by the Second Amendment." 895 F.3d 228, 233 n.1 (2d Cir. 2018). *Jimenez* involved a federal law that proscribes firearm ownership for individuals dishonorably discharged from the military. *See id.* at 231. The case had nothing to do with the application of the Second Amendment to non-citizens, and the opinion contains no holding addressing that issue.

[4] *See also* Amar, *supra*, at 48 n.* ("[A]rms bearing and suffrage were intimately linked two hundred years ago and have remained so.").

11

were not "entitled to the rights of English subjects," and "[t]heir inability to legally own guns … confirmed their status as outsiders" to the political community. *Id.* at 141. A Virginia statute from 1756 was even more restrictive, barring Catholics from owning arms unless they swore "allegiance to the Hanoverian dynasty and to the Protestant succession." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 157 (2007). That measure, which followed longstanding English practice, [5] was "consistent with the undivided allegiance to the sovereign that had been the definition of membership in the English body politic since the Reformation." Churchill, *supra*, at 157.

Following independence, membership in the political community remained a precondition to the right to keep and bear arms, as "the new state governments … framed their police power to disarm around a test of allegiance." *Id.* at 159. Pennsylvania barred those who refused to declare their allegiance to the commonwealth from owning arms. *Id.* Several other states followed that practice. *Id.* at 159-60. Those refusing to swear allegiance to their states not only lacked the right to keep and bear arms but also could not vote, hold office, or serve on juries, further indicating their exclusion from the political community. *Id.* State constitutions in the early republic

---

[5] The provision of the English Bill of Rights that "has long been understood to be the predecessor to our Second Amendment" limited the right to "'have Arms for their Defense'" to "'Subjects which are Protestants.'" *Heller*, 554 U.S. at 593 (quoting 1 W. & M., ch. 2, § 7, *in* 3 Eng. Stat. at Large 441).

continued a similar practice by restricting the right to keep and bear arms to citizens.[6]

The connection between the right to keep and bear arms and membership in the political community forecloses Perez's argument that he is "among 'the people' protected by the Second Amendment." Appellant's Br. 8. "Illegal aliens are not 'law-abiding, responsible citizens' or 'members of the political community.'" *Portillo-Munoz*, 643 F.3d at 440. That illegal aliens remain outside the political community is reflected throughout the Constitution and federal law. Illegal aliens may not hold federal elective office, U.S. Const. art. I, § 2, cl. 2; *id.* art. I § 3, cl. 3; *id.* art. II, § 1, cl. 5, are barred from voting in federal elections, 18 U.S.C. § 611(a), may not serve on federal juries, 28 U.S.C. § 1865(b)(1), and are subject to removal from the United States at any time, 8 U.S.C. § 1227(a). Accordingly, illegal aliens are not "members of the political community"—that is, "the people"—who may invoke the Second Amendment. *Heller*, 554 U.S. at 580.[7]

---

[6] *See, e.g.*, Ala. Const. of 1819, art. I, § 23 ("Every citizen has a right to bear arms in defence of himself and the State."); Conn. Const. of 1818, art. I, § 17 ("Every citizen has a right to bear arms in defense of himself and the State."); Ky. Const. of 1792, art. XII, § 23 ("The rights of the citizens to bear arms in defence of themselves and the State shall not be questioned."); Me. Const. of 1819, art. I, § 16 ("Every citizen has a right to keep and bear arms for the common defence; and this right shall never be questioned."); Miss. Const. of 1817, art. I, § 23 ("Every citizen has a right to bear arms in defence of himself and the State."); Pa. Const. of 1790, art. IX, § 21 ("That the right of the citizens to bear arms, in defence of themselves and the state, shall not be questioned.").

[7] In his brief to the district court, Perez acknowledged that *Heller* "offhandedly use[s] language such as 'law-abiding citizens' and 'members of the political community'" but argued that "those sections of the Court's

13

*   *   *

I would hold that illegal aliens lack protection under the Second Amendment and affirm Perez's conviction on that ground. Because the court reaches this conclusion in an indirect manner that departs from the analysis that would normally apply under the Second Amendment, I concur only in the judgment.

---

opinion did not reflect a deliberate attempt to define the term 'the people.'" App'x 19. Yet the portion of *Heller* defining "the people" as "members of the political community" appears in the section of the opinion that defines the meaning of the clause "Right of the People." 554 U.S. at 579-81.